**BARSEBÄCK KRAFT AB and Empresa Nacional del Uranio, S.A.**

v.

**The UNITED STATES.**

No. 95–415C.

United States Court of Federal Claims.

Aug. 9, 1996.*

Reissued for Publication Nov. 20, 1996.

---

* This Opinion was filed unpublished on August 9, 1996. Thereafter, the defendant filed a Motion for Publication pursuant to Rule 52.1(b). This motion has now been allowed, and the Opinion is reissued for publication this date, November 20, 1996.

Alex D. Tomaszczuk, McLean, VA, for plaintiffs. Jay E. Silberg, Dean D. Aulick, John H. O'Neill, Jr., Robert M. Di Giovanni, and John E. Jensen, of counsel.

Allen L. Lear, Washington, DC, with whom was Assistant Attorney General Frank W. Hunger, for defendant. Mitchell J. Matorin, of counsel.

## OPINION

YOCK, Judge.

This Government contract case comes before the Court on the defendant's motion for summary judgment under Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"). The plaintiffs in this action, two foreign electric utilities corporations, each individually entered into uranium enrichment services contracts with the United States Department of Energy ("DOE") in 1984. Responsibility for the contracts was eventually transferred, under the Energy Policy Act of 1992, to the United States Enrichment Corporation ("USEC") from the DOE. The plaintiffs allege in their Complaint that from July 1, 1993, the date on which the USEC assumed responsibility for the contracts from the DOE, until the present time, the USEC has overcharged the plaintiffs for its uranium enrichment services.

For the following reasons, the defendant's motion for summary judgment is granted, and the plaintiffs' Complaint is to be dismissed.

### Factual Background

The first plaintiff, Barsebäck Kraft AB ("Barsebäck"), is a wholly-owned subsidiary of Sydkraft AB, an investor-owned Swedish energy company with ownership interests in five different nuclear power units. Barsebäck is the owner and operator of the Barsebäck nuclear power plant. The second plaintiff, Empresa Nacional del Uranio, S.A. ("ENUSA"), is a national nuclear fuel cycle company that is owned by the Government of Spain and which purchases nuclear fuel for nuclear power plants in Spain.

Prior to entering into the contracts at issue, the respective governments of each of the plaintiffs entered into treaties that relate to the purchase of enriched uranium. Initially, on March 20, 1974, the United States and Spain entered into a treaty entitled "Atomic Energy: Cooperation for Civil Use" ("Agreement for Cooperation"). Pursuant to this treaty, the United States agreed that if Spain or authorized persons were prepared to enter into contracts with the United States for uranium enrichment services, "the Government of Spain or such authorized persons will have access on an equitable basis with other purchasers of such services to uranium enrichment * * *." Def.'s App. at 260.[1] The Agreement for Cooperation continues that "*[u]nder such terms and conditions as may be agreed*" the Atomic Energy Commission could transfer enriched uranium to

---

**1.** All references to the Defendant's Appendix, filed on September 5, 1995, with its Motion for Summary Judgment, will be denoted as "Def.'s App. at __."

Spain or such authorized persons. Def.'s App. at 260.

Subsequently, on December 13, 1983, the United States and Sweden entered into a similar treaty entitled "Agreement for Cooperation Between the United States of America and Sweden Concerning Peaceful Uses of Nuclear Energy" ("Agreement for Cooperation"). The Agreement for Cooperation did not specifically mention enriched uranium services, however, a subsequent letter to the Swedish Minister for Foreign Affairs from the American Ambassador to Sweden, Mr. Franklin S. Forsberg, makes specific reference to the purchase of enriched uranium and the parties' understandings with respect to its purchase. Specifically, Mr. Forsberg explained that:

> With respect to any contract executed between the United States Atomic Energy Commission and the Government of Sweden or authorized persons under its jurisdiction * * * prices for uranium enriched in the isotope U–235 or charges for enrichment services * * * will be those in effect for users in the United States of America at the time of delivery.

Pls.' App. at 148.[2] In other words, the United States agreed that it would charge Sweden or authorized persons the same price for enriched uranium services as similarly situated domestic customers at the time of delivery.

In 1984, as contemplated by the respective Agreements for Cooperation, the plaintiffs entered into their respective contracts. Under the contracts, the plaintiffs agreed to purchase a fixed percentage of their enriched uranium needs from the DOE for a period of 30 years or the life of the longest operating nuclear power facility included under the contracts, whichever is less. The contracts do provide, however, that each plaintiff can terminate their respective contract provided they gave 10 years' notice. In turn, the contracts also include a number of stipulations and limitations with respect to the prices the DOE could charge for uranium enrichment services. First, Article IV(1), which is the pricing provision of the con-

tracts, describes the manner by which the DOE, and subsequently the USEC, is to determine uranium enrichment prices. Article IV(1) states that "[t]he charges to be paid to DOE for enrichment services provided to the Customer hereunder will be determined in accordance the with *established DOE pricing policy* for such services." (Emphasis added.) "Established DOE pricing policy" is defined in Article I(8) of the contracts as "any policy established by DOE that is applicable to prices or charges *in effect at the time of performance of any services* under this contract." (Emphasis added.) Aside from this limitation, the DOE could charge any price it wanted, so long as the price did not exceed what is termed the "ceiling price" under the contracts. Article IV(1) provides the "ceiling price," which is a fluctuating sum dependent upon a formula that accounts for changes in electrical rates and the purchasing power of the dollar. Finally, under Article IV(3) of the contracts, the DOE could increase the price for enrichment services provided that the DOE gave the customer 180 days' prior written notice.

As discussed *supra*, Article IV(1) of the contracts provides that the prices charged for uranium enrichment services must comport with "established DOE pricing policy." At the time the contracts were entered into, the "established DOE pricing policy" was that the DOE's prices would be based upon recovery of the Government's costs over a reasonable period of time. This pricing policy was the result of an extra-contractual, congressionally-imposed limitation on the pricing discretion provided to the DOE under the contracts. This final pricing policy, however, was merely the final version in a series of standards established by Congress over a number of years dictating the manner in which uranium enrichment services were to be priced. In 1964, the first stage in this process commenced with Congress's passage of the Private Ownership of Special Nuclear Materials Act (the "Nuclear Materials Act"), Pub.L. No. 88–489, which allowed private parties to own enriched uranium and other nuclear materials. The Nuclear Materials

**2.** All references to the Plaintiffs' Appendix, filed on October 18, 1995, with its Opposition to the Defendant's Motion for Summary Judgment, will be denoted as "Pls.' App. at ___."

Act was included as a series of amendments to the Atomic Energy Act of 1954 (the "Atomic Energy Act"). As part of the Nuclear Materials Act, section 161(v) was added to the Atomic Energy Act. This provision endowed the Atomic Energy Commission ("AEC") with the authority to enter into uranium enrichment services contracts with private parties. Section 161(v) also included a provision limiting the price that the AEC could charge for its uranium enrichment services. Specifically, the original section 161(v) stated that "any prices established under this subsection shall be on a basis which will provide reasonable compensation to the Government." Next, in 1970, Congress amended section 161(v), and hence the AEC's pricing discretion, to read: "any prices established under this subsection shall be on a basis of *recovery of the Government's costs over a reasonable period of time.*" (Emphasis added.) Eventually, in 1977, the DOE replaced the AEC as the agency responsible for administering the uranium enrichment services program. Included in this change was the transfer of contracting authority for uranium enrichment services contracts to the DOE. However, the cost-based pricing requirement contained in section 161(v) continued as the "established DOE pricing policy" through the period of time that the present contracts were entered into by the parties.

Section 161(v) of the Atomic Energy Act also directed the AEC, and later the DOE, to establish, in writing, the criteria by which the AEC's uranium enrichment services would be made available. Specifically, section 161(v) stated that the AEC "shall establish criteria in writing setting forth the terms and conditions under which services provided under this subsection shall be made available * * *." H.R.REP. No. 91–1470, 91st Cong., 2d Sess. (1970), *reprinted in* 1970 U.S.C.C.A.N. 4981, 5000. Pursuant to this directive, the AEC, and later the DOE, published a series of Uranium Enrichment Services Criteria ("Enrichment Criteria") in the Federal Register and subsequently in the Code of Federal Regulations ("CFR"). The DOE's final Enrichment Criteria were published in 1986 and state that: "DOE will

establish charges for enrichment services on a basis that recovers appropriate Government costs over a reasonable period of time." 10 C.F.R. § 762.5 (1986). The Enrichment Criteria also listed those costs that the DOE would recover in its prices. According to the final Enrichment Criteria, the following costs were included in the DOE's prices: (1) power costs; (2) power not taken costs; (3) other operating costs, including certain decontamination and decommissioning (D & D) costs; (4) costs associated with atomic vapor laser isotope separation technology; (5) depreciation; (6) imputed interest; and (7) other miscellaneous costs. Finally, as with all of the DOE Enrichment Criteria previously published, the Criteria expressly noted that "these criteria are established pursuant to section 161(v) of the [Atomic Energy] Act." 10 C.F.R. § 762.1 (1986).

The Energy Policy Act of 1992 ("Energy Policy Act") implemented a series of significant changes in the uranium enrichment services program. Initially, as a result of the Act, section 161(v) of the Atomic Energy Act was altered, deleting all language providing the DOE with contracting authority for uranium enrichment services and eliminating the cost-based pricing constraint. The Act concomitantly transferred responsibility for administering the uranium enrichment services program from the DOE to the newly-created USEC. The USEC was established as a wholly-owned Government corporation, with the United States Treasury as the sole shareholder and with the intent that the USEC would eventually be privatized. The USEC's goal was to complete this privatization process possibly by as early as 1996. Pursuant to the Energy Policy Act of 1992, the USEC assumed most aspects of the DOE's uranium enrichment services program, and accordingly, all pre-existing uranium enrichment services contracts were transferred to the USEC. Specifically, the Act provided that:

[A]ll contracts * * * with the [DOE], *including all uranium enrichment contracts* * * * that have been executed by the Department before the transition date [3] * * * shall transfer to the Corporation.

3. The "transition date," as used in the Act, is the date on which all contracts for uranium enrich-

42 U.S.C. § 2297c(b)(1) (1994) (emphasis added). Thus, the Energy Policy Act stipulated that the responsibility for administering the existing uranium enrichment contracts would transfer to the USEC from the DOE. Moreover, while the Energy Policy Act amended section 161(v) of the Atomic Energy Act by eliminating the cost-based pricing restriction under which the DOE was compelled to contract, Congress prescribed that the USEC was to establish its prices in the manner of a normal, profit-making corporation:

> The [USEC] shall establish prices for its products, materials, and services provided to customers other than the Department on a basis that will allow it to attain the normal business objectives of a profitmaking corporation.

42 U.S.C. § 2297c–1(a) (1994).

Finally, the Energy Policy Act also created the Uranium Enrichment Decontamination and Decommissioning Fund (the "D & D Fund"). 42 U.S.C. § 2297g (1994). The D & D Fund was established to pay "[t]he costs of all decontamination and decommissioning activities of the Department * * * until such time as the Secretary certifies and the Congress concurs, by law, that such activities are complete." 42 U.S.C. § 2297g–2(b) (1994). In addition, the D & D Fund is intended to pay the annual costs of remedial action at the DOE's gaseous diffusion facilities to the extent that amounts from the Fund are sufficient. 42 U.S.C. § 2297g–2(c) (1994). The D & D Fund is financed by deposits in the amount of $480 million per year, adjusted each year to account for inflation. The two sources of moneys for the Fund are: (1) a "special assessment" from user-utilities, not to exceed $150 million with the payment by each utility determined by a ratio of the amounts to be deposited each year by the total separative work units ("SWU")[4] the utility purchased from the DOE in previous years; and (2) an appropriation from Congress to the extent that the amounts received from the utilities are insufficient. 42 U.S.C. § 2297g–2(c) (1994).

ment services would officially transfer from the DOE to the USEC—in this case, July 1, 1993.

On June 28, 1993, the USEC informed all uranium enrichment customers, including the plaintiffs, that effective July 1, 1993, the contracts would transfer to the USEC. At this time, the price for uranium enrichment services was $125 per SWU. The USEC apprised all customers that it would adopt, on an interim basis, this price as its pricing policy for enrichment services. Subsequently, on June 24, 1994, the USEC notified all uranium enrichment customers that it was adopting a new pricing policy to replace the interim policy that it had announced on June 28, 1993. The new pricing policy provided that:

> USEC prices will ensure that (i) the Corporation generates sufficient revenues to remain a viable, long-term supplier of uranium enrichment services, (ii) the United States Treasury, as the Corporation's sole stockholder, receives a reasonable return on its investment in the uranium enrichment services business and (iii) the price a customer pays for additional incremental uranium enrichment services purchased from USEC is competitive in the marketplace. USEC will retain the flexibility to respond to the circumstances of all customers by negotiating prices and other contract terms on an individual basis.

Def.'s App. at 144. Moreover, the June 24, 1994 announcement also informed the USEC's customers that the price of $125 per SWU would remain in force, but that if the USEC determined that a price increase was necessary, the USEC would inform its customers in accordance with the terms of the contracts. The plaintiffs have continued to pay for the USEC's uranium enrichment services at a rate of $125 per SWU from July 1, 1993, through the present time. However, the USEC has also offered those purchasers of uranium enrichment services that entered into the contracts with the DOE, including the plaintiffs, the opportunity to renegotiate new contracts with the USEC. The contracts entered into pursuant to this offer have frequently included lower prices for the USEC's uranium enrichment services.

4. The separative work unit, or SWU, is the standard unit of measure for uranium enrichment services.

Initially, the plaintiffs attempted to informally persuade the USEC that its prices for uranium enrichment services were in violation of the contracts. However, when the USEC did not accede to these informal demands, both plaintiffs certified and submitted three sets of claims to the contracting officer under the disputes clause of the contracts. The claims of the plaintiffs were identical with the exception of the dollar amount claimed, which depended upon the amount of uranium enrichment services purchased. The plaintiffs' first claims were for damages allegedly incurred due to the USEC applying a pricing methodology not based on the USEC's costs. In other words, damages as a result of the USEC foregoing the former cost-based pricing methodology that the DOE had employed. The plaintiffs' second set of claims sought damages based on the difference between the market price of the uranium enrichment services and the prices charged by the USEC. Finally, the third claim was for the USEC allegedly double-charging the plaintiffs for decontamination and decommissioning costs by purportedly including charges for these items in its prices, yet the utilities were also paying for these costs by assessment through the D & D Fund. The plaintiffs' claims were each denied *in toto* by the USEC's contracting officer. Barsebäck received the contracting officer's final decision on or about March 28, 1995. ENUSA received its decision on or about May 9, 1995. On June 22, 1995, the plaintiffs filed the present Complaint with this Court.

## Discussion

■ In their Complaint, the plaintiffs assert, in the alternative, the same three claims previously submitted to the contracting officer. The first claim is for damages equivalent to the difference between the prices actually charged by the USEC and the costs incurred by the Government. The second claim is for damages amounting to the difference between the price charged by the USEC and the market price for uranium enrichment services. The third claim is for damages resulting from the USEC allegedly including in its prices charges for D & D and remedial costs. As support for their first damages claim, the plaintiffs argue that the original cost-based "established DOE pricing policy" still governs the pricing of the uranium enrichment services under the contracts.[5] The second damages claim is premised on the plaintiffs' hypothesis that there are two constraints on the USEC's pricing discretion. The first is the Uniform Commercial Code (U.C.C.) § 2–305(2), which requires a party with complete discretion to set the price under a contract to exercise that discretion in good faith. The second constraint proposed by the plaintiffs are the individual Agreements for Cooperation the United States entered into with Spain and Sweden, respectively. According to the plaintiffs, these treaties require the United States to price the contracts in a nondiscriminatory fashion. The plaintiffs' final damage theory is based on the argument that the plaintiffs are already paying for decontamination and decommissioning costs through the D & D Fund. As such, the plaintiffs aver that the USEC has no basis for again charging the plaintiffs for these costs under the contracts. On April 13, 1995, the defendant filed the present motion for summary judgment.

---

**5.** The plaintiffs also argue in their Complaint that if the cost-based pricing policy is deemed abrogated with the passage of the Energy Policy Act, then the contracts have a pricing provision that is "open" according to U.C.C. § 2–305(1)(c). U.C.C. § 2–305(1)(c) requires in such instances that courts impose a "reasonable" price, as measured by cost. However, the plaintiffs seem to have abandoned this argument, failing to mention or develop its basis in any of the briefs submitted in response to the defendant's motion for summary judgment. Nevertheless, even assuming that the U.C.C. applies to these contracts, it seems to this Court that U.C.C. § 2–305(1)(c) would not govern the pricing of these contracts.

U.C.C. § 2–305(1)(c) applies when "the price is to be fixed in terms of some agreed market or other standard as set or recorded by a third person or agency *and is not so set or recorded."* U.C.C. § 2–305(1) (emphasis added). However, in the case at bar, while the price under the contracts was to be set in accordance with a particular standard (*i.e.,* "established DOE pricing policy"), it was set in accordance with this standard. The plaintiffs do not contend here that the price was not set according to a standard, merely that the USEC is not empowered to set a standard in the first place. As such, U.C.C. § 2–305(1)(c) seems inapplicable to the case at bar.

■ Summary judgment is properly granted when there are no genuine issues of material fact, RCFC 56(c); *Anderson v. Liberty Lobby,* 477 U.S. 242, 247–49, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986), and the movant is entitled to judgment as a matter of law. RCFC 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The moving party has the burden of proving that there are no genuine issues of material fact. *Celotex Corp.,* 477 U.S. at 317, 106 S.Ct. at 2548. However, not all factual issues are material, only those that may be dispositive are deemed material, and therefore, may preclude summary judgment. *Blake Constr. Co. v. United States,* 28 Fed.Cl. 672, 683 (1993), *aff'd,* 29 F.3d 645 (Fed.Cir.1994). In addition, if there is any doubt as to factual issues, they must be resolved in favor of the nonmoving party, and all presumptions and inferences should be drawn in favor of the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986). Generally, interpreting the terms of a contract is a matter of law that is appropriate to resolve on a motion for summary judgment. *J.B. Steel, Inc. v. United States,* 810 F.2d 1139 (Fed.Cir.1987).

The crux of this case relates to the effect of the enactment of the Energy Policy Act of 1992 upon the contracts at issue. As discussed, the Act transferred the contracts, and most other aspects of the DOE's uranium enrichment services program, from the DOE to the USEC. Concomitantly, the Energy Policy Act repealed that portion of section 161(v) of the Atomic Energy Act that had required the DOE to establish its prices on the basis of recovery of its costs and further provided that the USEC could set prices for its services in the manner of a normal, profit-making enterprise. The primary questions now faced by this Court, then, are as follows:

(1) Did the enactment of the Energy Policy Act of 1992 abrogate the DOE's cost-based pricing policy in effect at the time the plaintiffs entered into the contracts?

(2) If the DOE's cost-based policy is a nullity, did the Energy Policy Act and/or the contracts empower the USEC to establish pricing policy for the present contracts? and

(3) If the USEC is empowered to establish pricing policy under the contracts, are there any constraints on what the USEC can now charge the plaintiffs for uranium enrichment services? After these questions are answered, the Court will then address the subject of the alleged double charging of the plaintiffs for D & D and remedial costs.

■ As to the first question, the defendant contends that the former cost-based pricing policy of the DOE cannot apply because it no longer exists. The defendant points out that the DOE's cost-based pricing policy was solely the result of former section 161(v)'s directive, which was repealed with the enactment of the Energy Policy Act of 1992. The plaintiffs attempt to rejoin by arguing that the cost-based pricing policy is not inconsistent with any of the provisions contained in the Energy Policy Act. Moreover, the plaintiffs maintain that no provision of the Act expressly required the abandonment of the existing DOE cost-based pricing policy.

■ Initially, this Court finds that the USEC is proscribed by law from following a cost-based pricing policy. Section 2297c–1 of the Energy Policy Act of 1992 states that the USEC *"shall* establish [its] prices * * * on a basis that will allow it to attain the normal business objectives of a profitmaking corporation." 42 U.S.C. § 2297c–1 (1994) (emphasis added). By law, then, the USEC *must* establish its prices in the manner of a normal, profit-making corporation. Thus, it is legally impermissible for the USEC to apply the former cost-based pricing policy to its enrichment services contracts because employing such a policy is contrary to the manner in which a normal, profit-making corporation would price its services.

■ Moreover, this Court finds that the cost-based pricing policy does not constrain the USEC's pricing of the present contracts because that cost-based pricing policy was eviscerated by the Energy Policy Act of 1992. There were two sources of the DOE's cost-based pricing policy and both have been rendered a nullity by the Energy Policy Act. The first source of the cost-based pricing

requirement was section 161(v) of the Atomic Energy Act, which specified that prices for enrichment services must be established "on a basis of recovery of the Government's costs over a reasonable period of time." However, since that portion of section 161(v) that included the cost-based pricing requirement has been repealed with the passage of the Energy Policy Act, section 161(v) no longer proscribes the USEC from charging prices on a basis other than merely recovery of the Government's costs. The second source of the cost-based pricing requirement was the DOE's actual pricing policy as published in the Enrichment Criteria, which necessarily incorporated the section 161(v) statutory mandate that the DOE establish its prices solely on the basis of recovery of the Government's costs. The Court similarly finds that the actual pricing policy in effect at the time the DOE entered into the contracts is inapplicable to the present contracts. This is the case for two reasons. First, the Enrichment Criteria are void since the cost-based pricing policy contained therein directly conflicts with the Energy Policy Act. The DOE's final pricing policy was included in the DOE's Enrichment Criteria at 10 C.F.R. § 762.5 (1986), and stated that:

> "DOE will establish charges for enrichment services on a basis that recovers appropriate Government costs over a reasonable period of time * * *."

As earlier explained, this regulation mandated that the DOE was to establish its prices solely on the basis of recovery of the Government's costs. However, the Enrichment Criteria directly conflict with the Energy Policy Act's statement as to how the USEC should establish its prices. The Energy Policy Act provides that the USEC "shall establish prices for its * * * services * * * on a basis that will allow it to attain the normal business objectives of a profitmaking corporation." 42 U.S.C. § 2297c–1 (1994). Thus, the regulation prescribing the DOE's former cost-based pricing policy directly conflicts with the Energy Policy Act. It is well established that a regulation is only effective to the extent that it does not conflict with the

statute under which it was implemented. *United States v. Larionoff*, 431 U.S. 864, 871, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48 (1977); *State of Illinois v. United States Dep't of Health and Human Serv.*, 772 F.2d 329, 334 (7th Cir.1985). A complementary axiom to this rule is that a regulation that contradicts a separate federal statute is a nullity. *Spears v. Merit Sys. Protection Bd.*, 766 F.2d 520, 523 (Fed.Cir.1985); *Commonwealth of Massachusetts by Dep't of Pub. Welfare v. United States*, 15 Cl.Ct. 73, 80 (1988). This is the case here. The Energy Policy Act requires the USEC to price its uranium enrichment services in the manner of a profit-making corporation. The Enrichment Criteria directly oppose this directive by requiring prices based solely on recovery of the Government's costs. As a result of this conflict, the Enrichment Criteria are invalid.[6]

Moreover, it seems to this Court that the regulation is void for a separate reason. Regulations can only be promulgated pursuant to a valid statute. In fact, the Enrichment Criteria explicitly state that the regulation was "established pursuant to section 161(v) of the [Atomic Energy Act]." However, that portion of section 161(v) of the Atomic Energy Act containing the directive to publish the Enrichment Criteria was repealed with the passage of the Energy Policy Act of 1992. Accordingly, the statute which created the authority for the promulgation of the Enrichment Criteria has been repealed. In such a case, it would seem that the regulations no longer have any force or effect. A regulation has no legal foundation if the statute under which it was promulgated is subsequently repealed. Thus, it is evident to this Court that with the passage of the Energy Policy Act, and its subsequent modification of section 161(v) of the Atomic Energy Act deleting the directive to publish the Enrichment Criteria, the regulations publishing the DOE's pricing policy became a nullity and have no legally binding effect.

Accordingly, the Court finds that the effect of the Energy Policy Act of 1992 was to

---

**6.** In fact, the Enrichment Criteria were recently repealed. Removal of Obsolete Regulations, 60 Fed.Reg. 49,195, 49,196 (Sept. 22, 1995).

invalidate the cost-based pricing policy under which the DOE had performed the contracts. As a result, this Court finds that the USEC is not required to price its services under the contracts pursuant to a cost-based pricing constraint.

■ The next question before this Court, then, is whether with the passage of the Energy Policy Act of 1992, the power to establish pricing policy for the contracts was transferred from the DOE to the USEC. In its motion for summary judgment, the defendant points out that the terms of the contracts provided the DOE with the authority to establish *any* pricing policy, as long as the price was below the ceiling price. From this premise, the defendant posits that since the Energy Policy Act of 1992 transferred the contracts to the USEC, the USEC is vested with the same rights under the contracts as the DOE, and, thus, can similarly establish *any* pricing policy it believes proper.

The plaintiffs, while agreeing that the USEC is vested with all of the rights under the contracts that the DOE had, argue that the authority to set pricing policy was not a right the DOE had under the contracts. Rather, the plaintiffs maintain that the DOE's pricing policy was established *outside* of the contracts and then applied *to* the contracts. Thus, the plaintiffs conclude that the DOE's authority to establish pricing policy was "extra-contractual" and did not transfer to the USEC under the Energy Policy Act of 1992. The plaintiffs do not attempt to identify the source of this purportedly "extra-contractual" authority to establish pricing policy for the contracts. Instead, the plaintiffs merely proffer a series of arguments seeking to buttress their contention that the source of the DOE's authority was not the contracts. The plaintiffs first note that the DOE could not unilaterally change the pricing policy, but that any modifications to the pricing policy had to comply with the Enrichment Criteria, which specified that the DOE's prices must be based on recovery of the Government's costs. Second, the plaintiffs again point to the Enrichment Criteria and argue that the mere fact that the DOE published the pricing policy as a regulation indicates that the DOE's authority to estab-

lish pricing policy for the contracts was extra-contractual. Third, the plaintiffs posit that the fact that the cost-based pricing policy existed prior to the contracts indicates that the DOE's pricing policy was extra-contractual.

Distilled to its core contention, the plaintiffs' first hypothesis is this: since any changes to the DOE's pricing policy had to comport with DOE regulations, specifically the Enrichment Criteria, the power to set pricing policy for the contracts was extra-contractual. However, the fact that any changes to the DOE's pricing policy had to comport with the Enrichment Criteria is immaterial in determining the source of the DOE's authority to establish pricing policy for the contracts. Of course any changes to the DOE's pricing policy had to comply with the Enrichment Criteria since the Enrichment Criteria embodied the statutory requirement, contained in section 161(v) of the Atomic Energy Act, that the DOE had to base its prices on recovery of the Government's costs. Thus, the fact that any changes to the DOE's pricing policy had to comply with the Enrichment Criteria merely reflects that the DOE's pricing policy had to comport with the statutory prescriptions of section 161(v). However, this does not indicate that the source of the DOE's authority to establish pricing policy under the contracts was extra-contractual. Rather, it demonstrates that the *cost-based pricing requirement was imposed extra-contractually.* By the terms of the contracts, the DOE was free to establish *any* pricing policy it chose. Article I(8) of the contracts defines "established DOE pricing policy" as *"any policy established by DOE * * *."* (Emphasis added.) The only *contractual* limitation on this discretion was that the price not exceed the "ceiling price." By contrast, the cost-based pricing limitation on the DOE's otherwise unfettered discretion was a *statutory* proscription. As discussed, section 161(v) of the Atomic Energy Act imposed upon the DOE the requirement that it base its prices on recovery of the Government's costs. This requirement was necessarily embodied in the pricing policy published in the Enrichment Criteria. Accordingly, it was only due to section 161(v)'s extra-contractual, statutory

limitations that the DOE could not alter its pricing policy in a way that would conflict with Enrichment Criteria. This fact, however, merely reveals the source of the cost-based pricing restriction. It does not disclose the origin of the DOE's authority to establish pricing policy for the contracts in the first instance.

The plaintiffs also rely on the fact that the pricing policy was published by regulation in the Enrichment Criteria as support for their argument that the power to establish pricing policy for the contracts was extra-contractual. This statement, however, reflects the plaintiffs' continued misplaced focus on the manner in which the policy was published, as opposed to the source of the DOE's authority to establish pricing policy for the contracts in the first place. Moreover, the DOE's publication of its pricing policy by regulation merely reflected the DOE's compliance with section 161(v) of the Atomic Energy Act. As explained *supra,* section 161(v) of the Atomic Energy Act required the DOE to promulgate regulations explaining the criteria under which the DOE would offer its uranium enrichment services. The DOE complied with this missive by promulgating the Enrichment Criteria. The Enrichment Criteria, then, are simply a creature created pursuant to a statutory directive, and, as such, do not reveal anything about the source of the DOE's authority to establish pricing policy.

The plaintiffs also argue that since the cost-based pricing policy predated the contracts, this indicates that the pricing policy was extra-contractual. However, as with the plaintiffs' other contentions, this fact merely reveals the source of the cost-based pricing limitation. More specifically, the fact that the cost-based pricing restriction predates the contracts merely shows that section 161(v) of the Atomic Energy Act— the statutory source of the cost-based pricing limitation—was enacted prior to the commencement of the contracts. As discussed, however, the cost-based pricing limitation was wholly separate from the contracts and the DOE. Rather, the requirement that uranium enrichment service charges be based on cost recovery was dictated by *Congress,* as an express limitation

on the DOE's pricing authority. Thus, since the cost-based pricing policy was simply a function of a statutorily-imposed limitation, it is not indicative of the nature of the DOE's authority to establish pricing policy.

Accordingly, the undoing of the plaintiffs' position rests primarily with their preoccupation with both the source of the cost-based pricing limitation and the manner in which the DOE may have published the pricing policy. However, the first of these points relate to the extra-contractual, statutory limitations imposed by Congress on the discretion and authority vested in the DOE pursuant to the contracts. The second point merely reflects the manner in which the DOE published its pricing policy, not the source of its authority to establish pricing policy. Thus, these factors do not resolve the central question: What was the source of the DOE's authority to establish pricing policy for the contracts in the first instance?

There are only three possible sources of the DOE's authority to establish a pricing policy for the contracts: regulatory, statutory, or the contracts themselves. First, it is clear that the source is not regulatory. The only regulations that relate to the uranium enrichment services program are the Enrichment Criteria, located at 10 C.F.R. § 762 (1986). However, these regulations are bereft of any language providing the DOE with the authority to establish pricing policy. In fact, the Enrichment Criteria, rather than being regulations that empower an agency with authority, were merely published to comply with section 161(v)'s stipulation. In addition, the source certainly was not statutorily specific because the only statutory provision dealing with the DOE's pricing authority was section 161(v) of the Atomic Energy Act, which merely refers to limits on the DOE's pricing authority. However, this section contains no provision *explicitly* providing the DOE with the authority to establish a pricing policy in the first place.

 Thus, the sole remaining source for DOE's authority to establish a price policy for the contracts is the contracts themselves, and, in fact, this is the most logical source. While it is true that the authority to contract

is delegated to agencies from the sovereign, unless otherwise addressed by statute, the terms of the parties' relationship are defined by the contracts themselves. In the present case, Article IV of the contracts states that prices for uranium enrichment services will be determined in accordance with "established DOE pricing policy." Article I(8) defines "established DOE pricing policy" as "any policy *established by DOE* that is applicable to prices or charges * * *." (Emphasis added.) Accordingly, the contracts explicitly provide that the DOE could establish "any pricing policy." This is clearly language of empowerment, vesting in the DOE the authority to establish pricing policy for the contracts. Accordingly, since the Energy Policy Act of 1992 vested in the USEC the same rights and authority under the contracts as the DOE, the USEC is similarly empowered pursuant to the contracts to set "any" pricing policy, provided that the price does not exceed the "ceiling price" described in the contracts.

Additionally and perhaps more importantly, the Energy Policy Act of 1992 *itself* indicates that Congress intended for the USEC to establish prices for uranium enrichment services under the contracts. The Act stipulates that the USEC shall establish "prices for its * * * services provided to customers other than the Department on a basis that will allow it to attain the normal business objectives of a profitmaking corporation." 42 U.S.C. 2297c–1(a) (1994). This provision indicates two things to this Court. Initially, the statute clearly states that the USEC "shall establish prices" for its services. Thus, the Energy Policy Act explicitly provides the USEC with the *authority* to set prices for uranium enrichment services contracts. Moreover, the language of section 2297c–1(a) would seem by its omissions to provide that this pricing authority extends to contracts, such as those in the case at bar, entered into by the DOE and assumed by the USEC pursuant to the passage of the Energy Policy Act. This is clear for several reasons. One, included in the Energy Policy Act is section 2297c(b), which explicitly provides for the transfer of existing enrichment services contracts to the USEC. Consequently, Congress was obviously aware that

at the time the Act would take effect, there were existing contracts for uranium enrichment services, and the USEC would be assuming responsibility for these contracts. Two, Congress in enacting section 2297c–1(a) provided two sets of pricing policies—one for the USEC's private buyers and a second one for the DOE. However, in drawing distinctions as to how the USEC should price its services, the Act made no differentiations between existing customers and future customers. The only distinction was between the DOE and the USEC's private customers. Thus, it seems that Congress, armed with the knowledge that the USEC would be inheriting existing contracts, yet failing to distinguish how the USEC could charge those existing customers, intended to provide the USEC with plenary power over the pricing of existing uranium enrichment services contracts assumed by the USEC from the DOE.

Accordingly, this Court finds that the USEC is authorized to establish prices for uranium enrichment services under the contracts for two reasons. First, Congress explicitly provided in the Energy Policy Act of 1992 that the USEC is authorized to establish prices for enrichment services provided under the contracts. Second, this Court finds that the DOE's authority to establish pricing policy for the contracts was derived from the contracts themselves. As such, since with the passage of the Energy Policy Act the USEC assumed all of the authority under the contracts that had been vested in the DOE, the authority to establish pricing policy for the contracts was passed on to the USEC. Thus, the plaintiffs' first claim fails as a matter of law.

■ The next query, then, is whether there are any constraints on the USEC's pricing authority. The plaintiffs argue that there are two limitations on the USEC's pricing discretion: one, clauses in the two Agreements for Cooperation that allegedly preclude nondiscriminatory pricing; and two, the Uniform Commercial Code criterion contained in U.C.C. § 2–305(2), which requires that the party vested with the discretion to set the price under a contract must do so in

good faith.[7] Hence, the plaintiffs in their second claim in the alternative argue that even if the former cost pricing policy is invalid, the USEC is still constrained to establish prices in accordance with a good-faith *market price* standard.

■■■ However, contrary to the plaintiffs' contentions, it does not seem to the Court that either of the two Agreements for Cooperation constrains the USEC's pricing discretion under the contracts. The Court will first address Spain's Agreement for Cooperation and the inapplicability of the provisions to ENUSA's contract. The plaintiffs rely on Article VII of the Agreement for Cooperation between Spain and the United States for their argument that the Agreement precludes discriminatory pricing by the USEC. The pertinent clause states that ENUSA "will have *access* on an equitable basis with other purchasers of such services to uranium enrichment capacity * * *." (Emphasis added.) Def.'s App. at 260. However, the clause only refers to ENUSA having equitable "access" to uranium enrichment services. To this Court, "access" does not relate to matters such as contract price. Rather, "equitable access" seems to relate to a party having a fair opportunity to enter into such contracts. Matters such as a contract price are items for future negotiation. Indeed, subsequent paragraphs in Spain's Agreement for Cooperation validates this interpretation. Paragraph C of Article VII explains that the AEC could enter into contracts with any authorized person "[u]nder such terms and conditions as may be agreed * * *." Def.'s App. at 260. Thus, Spain's Agreement for Cooperation specifically notes that the terms of any future contracts would be agreed upon in the future. However, interestingly, this particular paragraph, the only paragraph in Spain's Agreement for Cooperation that specifically refers to contract formation and not access to such contracts, contains no references to discriminatory contract terms. As such, this Court concludes that Spain's Agreement for Cooperation contains no prohibitions on discriminatory contract terms in general or discriminatory pricing in particular and does not circumscribe the USEC's pricing discretion in any way.

■■■ The same analysis, perhaps more strongly, applies to Sweden's Agreement for Cooperation. The plaintiffs do not even rely on any paragraph or clause within the actual Agreement for Cooperation as support for their argument. Rather, the plaintiffs point to a letter that was sent from Mr. Forsberg, the American Ambassador to Sweden, to Mr. Bodstrom, Sweden's Minister of Foreign Affairs. In pertinent part, the letter explains that the parties had concurred in the Agreement for Cooperation that the prices under any future contracts for uranium enrichment services between the United States and any authorized person "will be those in effect for users in the United States of America at the time of delivery." Pls.' App. at 148. Aside from questions as to the permissibility of considering such extraneous evidence, the Court finds that the statement does not prohibit the discriminatory pricing that the plaintiffs maintain is occurring in the present case. The plaintiffs allege that the USEC's current policy is discriminatory in that the USEC is charging higher prices to its customers that continue to purchase uranium enrichment services under their original contracts than it is to those customers that have renegotiated and entered into new contracts with the USEC. The crux of the plaintiffs' Complaint, then, is that the USEC is offering lower prices to old customers who have entered into new contracts with the USEC than those customers, such as the plaintiffs, that have chosen to continue with their original contracts. However, even accepting the argument that the phrase to which the plain-

---

**7.** The plaintiffs also argue that there are two clauses, located in Articles X and XI of the contracts, that require nondiscriminatory pricing. However, upon examination, Article X has no relation to pricing, but rather to the terms under which the Government must rescind a notice of termination. In addition, Article XI, the Amendment clause, refers to the conditions under which the parties could amend the contracts. The problems with the application of this clause to the present dispute are twofold. First, this clause is not a particular bar to discriminatory pricing. Rather, it states that the parties could amend the contracts to eliminate discriminatory provisions. Second, the clause has not been invoked because the parties have not "mutually agreed" to amend the contracts, as required by Article XI.

tiffs have cited results in some nondiscrimination requirement, any such requirement would not extend to this instance. The only nondiscrimination requirement that can be inferred from the cited portion is that the United States agreed to offer Sweden or authorized persons uranium enrichment services at the same prices as similarly situated customers. If this were not the case, it would be impossible to discern which price was "in effect for users in the United States of America" because the prices would widely vary depending on the contract. Under this analysis, it is clear that the current prices charged by the USEC under Barsebäck's contract satisfy the requirements alleged by the plaintiffs. Barsebäck's contract price comports with those of the customers that have chosen to remain in the old contracts originally entered into with the DOE. As such, Barsebäck's contract price complies with the requirement, if indeed there is any such requirement, that the USEC offer Barsebäck the price "in effect for users in the United States of America."

 Finally, the Court will address whether any "good-faith" limitation imposed by the U.C.C. § 2–305(2) constrains the USEC's pricing authority to any degree. The plaintiffs primarily argue that since the USEC is vested with the discretion under the contracts to set the prices under the contracts, the U.C.C. § 2–305(2), which places a good-faith limitation on the party vested with pricing discretion thereunder, applies to the present contracts. The defendant counters that the U.C.C. simply does not apply to Federal Government contracts. Moreover, the defendant points out that the contracts are for services, not for goods, and the U.C.C. only applies to contracts for the sale of goods. Also, the defendant maintains that even if the U.C.C. were to be applied to these contracts, U.C.C. § 2–305 applies only if the price term is "open," which, the defendant argues, is not the case here because the contracts contain a ceiling price above which the USEC cannot charge.

 Initially, the Court agrees with the defendant that U.C.C. § 2–305(2) does not limit the USEC's pricing discretion because the U.C.C. simply is inapplicable to the present contracts. This is the case first of all because the present contracts are Federal Government contracts, and it is well settled that the U.C.C. does not apply to Government contracts. *GAF Corp. v. United States,* 932 F.2d 947, 951 (Fed.Cir.1991), *cert. denied,* 502 U.S. 1071, 112 S.Ct. 965, 117 L.Ed.2d 131 (1992). In addition, the present contracts are for uranium enrichment *services,* as indicated by the title of the contracts themselves. This is also indicated by what the USEC provides to its customers under the contracts. Under the contracts, the individual utilities supply the USEC with the uranium. The USEC then enriches the uranium and returns to the customer uranium enriched to the customer's specifications. The price paid by the customer is based on the number of SWUs required to enrich the uranium to the customer's specifications. It is clear, then, from the process itself, that the customers are contracting for services, not goods, from the USEC. The U.C.C. does not apply to service contracts—it applies to the purchase of goods. U.C.C. § 2–102. Accordingly, it is clear that any protections afforded to parties by the U.C.C. do not apply to the present contracts.

 Although the U.C.C. is inapplicable to the contracts at issue here, there are Federal Government contract/common law principles paralleling the U.C.C. that could provide similar protections to the plaintiffs. Under these legal theories, the implied covenant of good faith and fair dealing implies a duty on all parties to a contract which "limits the manner in which a party who is vested with discretion under the contract may exercise it by requiring that party to 'exercise that discretion reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties.'" *Abbott v. Amoco Oil Co.,* 249 Ill.App.3d 774, 189 Ill.Dec. 88, 94–95, 619 N.E.2d 789, 795–96, *appeal denied,* 153 Ill.2d 557, 191 Ill.Dec. 616, 624 N.E.2d 804 (1993); *see also Big Horn Coal Co. v. Commonwealth Edison Co.,* 852 F.2d 1259, 1267 (10th Cir.1988); *United States v. Yonkers Bd. of Ed.,* 611 F.Supp. 730, 739 (S.D.N.Y.1985); *Continental Mobile Tel.Co. v. Chicago SMSA, Ltd.,* 225 Ill.App.3d 317,

167 Ill.Dec. 554, 559, 587 N.E.2d 1169, 1174, *appeal denied*, 145 Ill.2d 632, 173 Ill.Dec. 2, 596 N.E.2d 626 (1992). However, as explained in *Big Horn Coal Company*:

"[I]t is possible to so draw a contract as to leave decisions absolutely to the uncontrolled discretion of one of the parties and in such a case the issue of good faith is irrelevant." * * * [In such a case] the parties expressly contracted for the unconditional right and thus they cannot reasonably expect any special implied protection * * *.

*Big Horn Coal Co.*, 852 F.2d at 1267–68; *see also Continental Mobile Tel. Co.*, 167 Ill.Dec. at 559, 587 N.E.2d at 1174. This is legally sound because the purpose of the covenant is to "protect the reasonable expectations of the parties by 'implying terms in the agreement.'" *Big Horn Coal Co.*, 852 F.2d at 1267 (citation omitted). Accordingly, if the parties contract for a provision that provides one party with unconditional discretion, the only reasonable expectations of the parties is that the party vested with such discretion will exercise that discretion at some point in time. This principle is well illustrated by *Continental Mobile Telephone Company*. In that case, the operator of cellular phone services included in its contract with the plaintiff, a reseller of cellular phone services, a provision allowing the operator to revise its rates and charges at its sole discretion. Later, when the operator changed its rates, the reseller filed suit, alleging a breach of the implied covenant of good faith and fair dealing and arguing that the defendant-operator's decision to change its rates breached its implied duty of good faith. However, the appellate court, in upholding the trial court's decision granting summary judgment, noted that the contract reserved in the operator the right to raise its rates at its discretion. Accordingly, the court held that "both parties were aware that defendant was able to raise its wholesale rates at any time, thereby negating any inference that defendant's actions were outside the contemplation of the parties and could be characterized as a breach of good faith." *Continental Mobile Tel. Co.*, 167 Ill.Dec. at 558, 587 N.E.2d at 1173. Likewise, in the present case, the parties contracted for a pricing provision that pro-

vides the USEC with the discretion to set the price for contracts with the only limitation being that the price cannot exceed the ceiling price. Both parties were aware, and the contracts specifically allowed, that the USEC could unilaterally establish prices under the contracts. The plaintiffs cannot argue then, that the USEC acted beyond the contemplation of the parties and thereby breached its good faith obligation when it simply exercised the discretion provided to it by the contracts.

■ In addition, the Court is unwilling to infer a good-faith limitation on the USEC's pricing discretion because the contracts already include a significant, bargained-for limitation on the USEC's pricing discretion. As explained earlier, under Article IV of the contracts, the DOE, and now the USEC, is proscribed from charging a price above the "ceiling price," which is a fluctuating sum determined pursuant to a formula that accounts for changes in electrical rates and the purchasing power of the dollar. The "ceiling price" was included as "price protection" for the DOE's uranium enrichment services customers. *See* Declaration of Dr. Shelby Brewer, Pls.' App. at 218. The "ceiling price" is a significant limitation on the USEC's pricing discretion, preventing the USEC from pricing the contracts in a manner that is completely disassociated from the market. This is the price protection for which the plaintiffs bargained, and, in fact, it is a significant limitation on the USEC's discretion. As such, the Court, in this instance, is unwilling to add protections beyond those significant contractual safeguards in place and for which the plaintiffs bargained. For these reasons, the plaintiffs' second claim also fails as a matter of law.

■ The Court will now address the plaintiffs' third and final claim for damages resulting from the USEC allegedly double-charging the plaintiffs for D & D and remedial costs. The plaintiffs aver in their Complaint that, while they must pay a yearly assessment to the D & D Fund pursuant to the Energy Policy Act of 1992, the USEC is also including in its contract prices charges

for D & D and remedial costs.[8] The plaintiffs' syllogism is as follows: (1) under the DOE's former pricing policy, the plaintiffs were charged $125 per SWU; (2) according to the Enrichment Criteria, included in this price was a charge for D & D and remedial costs; (3) according to the plaintiffs, DOE's charge per SWU included approximately $20.80 per SWU for D & D and remedial costs; and (4) the USEC continues to charge the plaintiffs a rate of $125 per SWU; thus, (5) the USEC must still be collecting $20.80 per SWU for D & D and remedial costs. The plaintiffs challenge this price structure, arguing that, with the enactment of the Energy Policy Act, the USEC was relieved of D & D and remedial costs with the creation of the D & D Fund. As such, the plaintiffs argue that it is impermissible for the USEC to charge the plaintiffs for D & D costs when it is relieved of these costs under the Energy Policy Act and that the plaintiffs are improperly being charged twice for D & D costs— once under the D & D Fund's special assessment and again under the USEC's contract charges for uranium enrichment services. The defendant counters by asserting that the USEC does not include in its contract prices any charge for D & D costs. Indeed, the defendant maintains that the USEC is wholly separate from the D & D Fund, makes no contributions to the Fund, and has no access to the Fund's money.

Initially, the plaintiffs' contention is legally untenable under the Energy Policy Act of 1992. The Act established the D & D Fund to cover all D & D and remedial costs at the DOE's enrichment facilities. However, the Fund is wholly separate from the USEC, and the USEC has no access to its deposits. 42 U.S.C. § 2297g(a) (1994) ("The Fund, and any amounts deposited in it * * * shall be made available to the Secretary [of the DOE].") Also, the Fund is financed by an assessment against former purchasers of the DOE's enriched uranium and, if necessary, an appropriation from Congress to cover any

deficit in the Fund. 42 U.S.C. § 2297g–1 (1994). The USEC is legally precluded, then, from making contributions to the D & D Fund. As such, the USEC does not, and indeed by law cannot, include in its prices a charge for D & D and remedial costs because: (1) the D & D Fund pays for all of these costs and is administered by the DOE, (2) the USEC is proscribed by the Energy Policy Act from even contributing to the Fund, and (3) the USEC has no access to the Fund's deposits. Thus, while it might appear at first blush that the plaintiffs' third claim raises material questions of fact, this is not the case because the USEC is precluded by law from including in its pricing policy and recovering under the contracts those costs associated with the D & D Fund.

Also, the plaintiffs' argument is defective in that, similar to their claim that the cost-based pricing policy still applies, this claim again relies on a pricing policy that no longer exists. The plaintiffs hypothesize that since the DOE included a charge for D & D and remedial costs in its prices and the USEC is charging the plaintiffs the same price as the DOE, the USEC similarly must be including decontamination and decommissioning costs in its prices. However, this logic, has as its basis the faulty assumption that the USEC organizes its price structure in the same manner as the DOE did. The linchpin of the plaintiffs' argument is the premise that the USEC is still pricing its uranium enrichment services on the basis of recovery of specific Government costs. However, the USEC no longer determines its prices on this basis. Rather, the USEC is authorized to price its services in the manner of a normal, profit-making corporation. 42 U.S.C. § 2297c–1 (1994). Thus, its prices do not bear a direct relationship to the cost structure on which the DOE based its prices. In addition, the plaintiffs' hypothesis reflects a misunderstanding as to the differences between the nature of the DOE and that of the USEC.

---

8. The Court notes that the plaintiffs in this case are challenging the USEC's price structure. Accordingly, this case is inapposite from the recent decision in *Yankee Atomic Elec. Co. v. United States*, 33 Fed.Cl. 580 (1995), in which the plaintiff contested the *DOE's* ability to collect the special assessment under the D & D Fund. As

such, the Court's rejection of the plaintiffs' claim in no way acts as collateral estoppel with respect to any future petitions by the plaintiffs under *Yankee Electric*, challenging the DOE's power to collect the special assessment under the D & D Fund.

The Energy Policy Act of 1992 directs the USEC:

(1) To operate as a business enterprise on a profitable and efficient basis.

(2) To maximize the long-term value of the Corporation to the Treasury of the United States.

* * * *

(7) To conduct the business as a self-financing corporation and eliminate the need for Federal Government appropriations or sources of Federal financing other than those provided in this division.

42 U.S.C. § 2297a (1994). Further, as noted earlier, the Energy Policy Act contemplates the USEC eventually becoming a privately-owned corporation. As such, the USEC must develop its prices in a manner that maximizes its ability to privatize in the near future. *See* Declaration of William H. Timbers, Def.'s App. at 135. Finally, as a wholly-owned Government corporation, the USEC has, as its sole shareholder, the United States Treasury. Thus, the USEC also pays dividends to the Treasury from its earnings. 42 U.S.C. § 2297c-3 (1994). Accordingly, the USEC must include many considerations in its prices that the DOE did not, such as long-term profitability, maximizing long-term value to the Treasury, paying dividends to the Treasury, and maximizing the prospects of near-term privatization. Thus, the plaintiffs' argument based on conjecture that the USEC must be including a charge for decontamination and decommissioning costs in its prices simply because the USEC continues to charge the same price the DOE had is fallacious, because the USEC, while it was relieved of many of the costs borne by the DOE, must also include many considerations in its prices with which the DOE was not burdened. It also does not raise a triable issue of fact. Accordingly, the plaintiffs' contention that it is being charged twice for D & D and remedial costs is found to lack merit as a matter of law.

In final summary, the defendant's summary judgment motion is granted with respect to all of the plaintiffs' three claims, *i.e.*, that the DOE's cost-based pricing policy continues to apply to the current contracts, that the USEC has failed to exercise its discretion in pricing its contract in a reasonable and good-faith manner using market standards, and that the USEC is double charging the plaintiffs for decontamination and decommissioning costs.

## CONCLUSION

For the foregoing reasons, the defendant's summary judgment motion is granted, and the plaintiffs' Complaint is to be dismissed.

Each party is to bear its own costs.