**FLORIDA POWER & LIGHT COMPANY, et al.**

v.

**The UNITED STATES.**

No. 96–644C.

United States Court of Federal Claims.

Aug. 12, 1998.

Alex D. Tomaszczuk, McLean, VA, for plaintiffs. Jay E. Silberg, John H. O'Neill, Jr., James B. Hamlin, Washington, DC, and Matthew A. Anzaldi, Arlington, VA, of counsel.

Mitchell J. Matorin, Washington, DC, with whom was Assistant Attorney General Frank W. Hunger, for defendant. Marc Kasischke, U.S. Department of Energy, of counsel.

## OPINION

YOCK, Senior Judge.

This action, in which the plaintiffs assert four theories of recovery based upon an alleged breach of contract by the Government, is presently before the Court on the defendant's Motion for Judgment on the Pleadings. For the reasons stated below, the defendant's motion is granted, and the plaintiffs' Complaint is to be dismissed.

### Background[1]

Prior to September 1, 1992, each of the seven plaintiffs[2] entered into a Utility Services Contract with the United States, pursuant to which the plaintiffs agreed to purchase fixed percentages of their enriched uranium needs from the defendant. Prior to July 1, 1993, these contracts were administered and performed by the United States through the Department of Energy ("DOE").

Article IV(1) of each contract provides that "[t]he charges to be paid to DOE for enrichment services provided to the Customer hereunder will be determined in accordance with the established DOE pricing policy for such services." "Established DOE pricing policy" is defined in Article I(8) of the Contracts as "any policy established by DOE that is applicable to prices or charges in effect at the time of performance of any services under this contract." The price for the services provided under the Contracts is limited by a "ceiling charge." The "ceiling charge," defined by a formula in Article IV(1), can vary annually based upon changes in electrical rates and the purchasing power of the dollar.

In addition to the contractual limitation of a "ceiling charge," the DOE's pricing discretion was limited by an extra-contractual, congressionally-imposed restriction. Section 161(v) of the Atomic Energy Act of 1954 mandated that "any prices established under this subsection shall be on a basis of recovery of the Government's costs over a reasonable period of time." 42 U.S.C. § 2201(v) (1988). Accordingly, the DOE promulgated "Enrichment Criteria," which provided that the established DOE pricing policy for uranium enrichment services would be based upon recovery of "appropriate Government costs over a reasonable period of time." 10 C.F.R. § 762.5 (1987).

The Energy Policy Act of 1992 ("EP Act") implemented a series of significant changes to the Atomic Energy Act of 1954 and, consequently, to the Government's uranium enrichment services program. That legislation established the United States Enrichment Corporation ("USEC"), an entity that, until 1998, was wholly owned by the Government. See 42 U.S.C. § 2297b (1994).[3] The responsibility for administering all of the Government's existing uranium enrichment services contracts, including those at issue in this case, was transferred from the DOE to the USEC. See id. § 2297c(b)(1). The effective date of this transfer was July 1, 1993. See id. § 2297b-14(e).

The EP Act also eliminated the statutory limit that had constrained the DOE to set charges on the basis of recovery of Government costs. In place of that pricing mandate, Congress directed the USEC to "establish prices for its products, materials, and services provided to customers other than the [DOE] on a basis that will allow it to attain the normal business objectives of a profitmaking corporation." Id. § 2297c-1(a). The DOE had been charging $125 per separative work unit ("SWU") immediately prior to the transfer of the uranium enrichment services contracts, and the USEC adopted

---

1. A comprehensive description of the contracts at issue in the instant case and of the circumstances leading up to the plaintiffs' claims in this suit is recited in *Barsebäck Kraft AB v. United States*, 36 Fed.Cl. 691 (1996), *aff'd*, 121 F.3d 1475 (Fed.Cir. 1997).

2. The seven plaintiffs named in this action are: Florida Power & Light Company ("FP & L"); Consolidated Edison Company of New York, Inc. ("ConEd"); Empresa Nacional del Uranio, S.A.

("ENUSA"); IES Utilities, Inc. ("IES"); Niagara Mohawk Power Corporation ("Niagara"); Pennsylvania Power and Light Company ("PP & L"); and Wisconsin Electric Power Company ("WEPCo").

3. The USEC was recently privatized and sold to the public for $1.9 billion. Shares began trading on July 23, 1998. *See Wash. Post*, July 29, 1998, at C10.

this price as its interim policy. On June 24, 1994, the USEC notified customers of its new pricing policy, which provided that:

> USEC prices will ensure that (i) the Corporation generates sufficient revenues to remain a viable, long-term supplier of uranium enrichment services, (ii) the United States Treasury, as the Corporation's sole stockholder, receives a reasonable return on its investment in the uranium enrichment services business and (iii) the price a customer pays for additional incremental uranium enrichment services purchased from USEC is competitive in the marketplace. USEC will retain the flexibility to respond to the circumstances of all customers by negotiating prices and other contract terms on an individual basis.

*Barsebäck Kraft AB v. United States,* 36 Fed.Cl. 691, 697 (1996), *aff'd,* 121 F.3d 1475 (Fed.Cir.1997).

Moreover, the EP Act created the Uranium Enrichment Decontamination and Decommissioning Fund ("D & D Fund"). *See* 42 U.S.C. § 2297g(a). The D & D Fund was established to pay "[t]he costs of all decontamination and decommissioning activities of the Department [of Energy] * * * until such time as the Secretary certifies and the Congress concurs, by law, that such activities are complete." *Id.* § 2297g–2(b). In addition, the D & D Fund is intended to pay the annual costs of remedial action at the DOE's gaseous diffusion facilities to the extent that amounts from the D & D Fund are sufficient. *See id.* § 2297g–2(c). The D & D Fund is financed by deposits in the amount of $480 million per year, adjusted annually to account for inflation. The two sources of monies for the D & D Fund are: (1) a "special assessment" of up to $150 million collected annually from domestic utilities that purchased SWUs from the DOE between 1945 and October 23, 1992, and (2) congressional appropriations. *See id.* § 2297g–1.

The DOE promulgated regulations in 1993 to implement the statutory mandate that it collect a special assessment from domestic utilities. *See* 10 C.F.R. § 766 (1994). The regulations set forth the formula used in calculating the amount of the annual special assessment charged to each domestic utility.

*See id.* § 766.102. The first annual special assessment, for Fiscal Year ("FY") 1993, was invoiced in September 1993. *See id.* § 766.103; (Def's. Mot. for J. on the Pleadings at ¶ 20; Pls.' Mem. in Opp'n at 8).

The imposition of the special assessment resulted in a spate of lawsuits by utility companies, including the case at bar. In the instant case, the plaintiffs allege that, for the first nine months of FY 1993 (October 1992 through June 1993), the DOE improperly included D & D costs in its contract prices while it recovered these same costs through the FY 1993 special assessment. Although not expressly enumerated in the Complaint, the plaintiffs assert four counts: (1) it was improper for the DOE purportedly to include D & D and remedial costs in its FY 1993 price calculation because all D & D costs for 1993 were to be paid solely from the D & D Fund (Compl.¶¶ 18–20); (2) recovery of D & D and remedial costs through both the D & D Fund and enrichment contract pricing resulted in an impermissible double recovery of the same costs (*id.* at ¶ 21); (3) the DOE's failure to reduce its contract prices to reflect funds provided via the D & D Fund breached competitive pricing provisions of the contracts (*id.*); and (4) the DOE's attempts to collect D & D and remedial costs was an impermissible demand for additional compensation from the plaintiffs, conduct proscribed by *Yankee Atomic Electric Co. v. United States,* 33 Fed.Cl. 580 (1995) (*id.*).

The plaintiffs submitted their claims to the DOE contracting officer in July 1995. The contracting officer denied the claims in their entirety in final decisions dated October 13, 1995. The plaintiffs filed their Complaint in this Court on October 11, 1996.

The defendant filed its Motion for Judgment on the Pleadings on December 3, 1997. The defendant contends that the Complaint should be dismissed as to all seven plaintiffs under the doctrines of *res judicata,* collateral estoppel, and *stare decisis.* The defendant also argues that, notwithstanding the applicability of those doctrines, the Complaint fails to state a claim upon which relief can be granted. Briefings were completed on April 1, 1998. Oral argument was not requested and is deemed unnecessary.

## Discussion

### I. *Applicable Law*

#### A. *Judgment on the Pleadings*

The defendant moves for judgment on the pleadings pursuant to Rule 12(c) of the Rules of the United States Court of Federal Claims ("RCFC"). In assessing the propriety of granting a judgment on the pleadings, the Court must assume that all of the plaintiffs' well-pled facts are true. *See Hospital Bldg. Co. v. Trustees of Rex Hosp.,* 425 U.S. 738, 740, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976). In addition, the Court ignores "assertions in the pleadings that amount to legal conclusions." *J.M. Huber Corp. v. United States,* 27 Fed.Cl. 659, 661 (1993). In the final analysis, such a motion should be granted only if "it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of his claim." *Id.* at 662.

#### B. *Legal Effects of Prior Adjudication*

Evaluation of the defendant's Motion for Judgment on the Pleadings requires consideration of three interrelated judicially-created doctrines: *res judicata,* collateral estoppel, and *stare decisis.*

#### 1. *Res Judicata (Claim Preclusion)*

The general rule of *res judicata,* also referred to as the doctrine of claim preclusion, provides that:

> when a court of competent jurisdiction has entered a final judgment on the merits of a cause of action, the parties to the suit and their privies are thereafter bound "not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose."

*Commissioner v. Sunnen,* 333 U.S. 591, 597, 68 S.Ct. 715, 92 L.Ed. 898 (1948) (quoting *Cromwell v. County of Sac,* 94 U.S. 351, 352, 24 L.Ed. 195 (1876)); *see also Federated Dep't Stores, Inc. v. Moitie,* 452 U.S. 394, 398, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981). The purpose of the doctrine is to protect defendants from repetitive lawsuits based on the same conduct and to encourage plaintiffs

" 'to litigate their claims in an economical and parsimonious fashion.' " *Marrese v. American Academy of Orthopaedic Surgeons,* 470 U.S. 373, 385, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985) (citation omitted). In addition, the doctrine encourages "reliance on judicial decisions, prevent[s] vexacious [sic] litigation, and permit[s] courts to resolve other pending suits being litigated for the first time." *Brown v. United States,* 3 Cl.Ct. 31, 41 (1983), *aff'd,* 741 F.2d 1374 (Fed.Cir.1984).

*Res judicata* will bar a subsequent suit if there has been a previous litigation (1) involving the same claim, (2) between the same parties or their privies, and (3) which resulted in a final judgment on the merits by a court of competent jurisdiction. *See Blonder–Tongue Lab., Inc. v. University of Ill. Found.,* 402 U.S. 313, 323–24, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971); *Phoenix Petroleum Co. v. United States,* 40 Fed.Cl. 862, 867 (1998). In determining whether or not two suits involve the same claim, the Court looks to the underlying facts. A "claim" consists of all rights a plaintiff has against a particular defendant "with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose." *Container Transp. Intern., Inc. v. United States,* 199 Ct.Cl. 713, 718, 468 F.2d 926, 929 (1972). In assessing which facts constitute a transaction or series of transactions, the Court is to weigh "such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectation or business understanding or usage." *Alyeska Pipeline Serv. Co. v. United States,* 231 Ct. Cl. 540, 545–46, 688 F.2d 765, 769 (1982) (quoting RESTATEMENT (SECOND) OF JUDGMENTS § 24(2) (1980)).

*Res judicata* prohibits a plaintiff "from asserting the same transactional facts under a different cause of action." *Bass v. United States,* 11 Cl.Ct. 295, 298 (1986). The doctrine "extends beyond those causes of action expressly included by the plaintiff in his claim to cover causes of action which were not but *should* have been raised in the prior litigation." *Brown,* 3 Cl.Ct. at 41; *see also Case, Inc. v. United States,* 88 F.3d

1004, 1011 (Fed.Cir.1996). In the particular context of a cause of action arising out of a contract, this Court and its predecessors have recognized the general rule that "the first suit must claim every breach that has then occurred." 18 Charles Alan Wright et el., Federal Practice and Procedure § 4408 (1981); see Container Transp., 199 Ct.Cl. at 720, 468 F.2d at 930 (holding that "every demand, if known, arising out of the shipment [contract] should be covered in one action—and, if that is not done, the plaintiff is and should be barred."); Alyeska, 231 Ct.Cl. at 546, 688 F.2d at 769 (asserting that " 'if the claimant, before filing its first suit, is in possession of all the facts on which its second suit is based, the splitting of the claims into multiple suits is fatal to maintenance of the later-filed action.' " (citation omitted)).

■■■ A second suit will not be precluded if it asserts a cause of action that was not yet available when a decision was rendered in a previous suit, even though that cause of action may arise from the same transaction or series of transactions that gave rise to the first suit. See Everett Plywood Corp. v. United States, 206 Ct.Cl. 244, 251, 512 F.2d 1082, 1087 (1975). Res judicata will operate to bar a second suit, however, if the cause of action asserted therein could have been brought, through amendment of the complaint, prior to issuance of the decision in the first suit. See id.; Electric Boat Co. v. United States, 81 Ct.Cl. 361, 368 (1935); Montego Bay Imports, Ltd. v. United States, 25 Cl.Ct. 639, 653 (1992).

■■■ Res judicata operates against a very small population. The doctrine only precludes relitigation of the same claims between the same parties or those in privity with the parties to the prior suit. As to these parties, it is fair to say that they have had their day in court with respect to the causes of action that were, or should have been, litigated. The preclusive effect of res judicata should not be extended to a nonparty to a suit, unless the Court determines that a party to the earlier suit "is so closely aligned with the non-party's interests as to be its virtual representative." Mother's Restaurant Inc. v. Mama's Pizza, Inc., 723 F.2d

1566, 1572 (Fed.Cir.1983) (applying the doctrine of issue preclusion against a plaintiff based upon virtual representation of the plaintiff in a prior litigation). Claim preclusion may also operate against a nonparty who " 'controls or substantially participates in the control of the presentation on behalf of a party.' " Id. (citation omitted).

■■■ Although the identity of actual parties to a suit is generally a straightforward task, confusion can arise when one of the named parties is a department or agency of the Federal Government. This Court and its predecessors have followed a bright-line rule to eliminate potential confusion in applying claim preclusion based upon a prior suit to which a federal entity was a party: "It is well established that suit against an agent or department of the Federal Government is a proceeding against the United States." Bass, 11 Cl.Ct. at 299; see also Larsen v. United States, 145 Ct.Cl. 178, 180, 170 F.Supp. 806 (1959); Burnett v. United States, 40 Fed.Cl. 806, 809 n. 5 (1998). Thus, a plaintiff who asserts a claim against one agency of the Government, and subsequently asserts a claim arising out of the same series of transactions against a different agency of the Government, risks the bar of res judicata in the second suit if the claim asserted therein could have been brought against the Federal Government in the prior suit. See, e.g., Montego Bay Imports, 25 Cl.Ct. at 654 (precluding plaintiff's claim against the Small Business Administration based upon preclusive effect of prior suit asserted against the United States Coast Guard).

■■■ Not all judicial proceedings between parties yield results with res judicata effect. Claim preclusion is not an appropriate mechanism for barring causes of action upon which the parties have not had a full and fair opportunity to litigate. Only a disposition which is considered to be a final judgment on the merits of a claim will operate to preclude reassertion of the claim in a subsequent suit between the same parties or their privies.

■■■ A trial is not necessarily required for a judgment to meet the requisite "final judgment on the merits" quality for res judicata purposes. Certain dispositions short of

trial provide the parties with such a full and fair opportunity to litigate that the disposition will preclude subsequent litigation of the same claim. A summary judgment granted pursuant to RCFC 56 represents a final judgment on the merits of a claim, as such judgment rests on a determination that the merits of a claim present no genuine issue of material fact. *See Kunkes v. United States,* 78 F.3d 1549, 1550 n. 2 (Fed.Cir.1996); *Indium Corp. of Am. v. Semi–Alloys, Inc.,* 781 F.2d 879, 883 (Fed.Cir.1985); RCFC 56(c); *see generally* 18 CHARLES ALAN WRIGHT ET AL., *supra,* § 4444. In addition, the voluntary dismissal of a suit "with prejudice" constitutes a final judgment on the merits of that suit for *res judicata* purposes. *See Lawlor v. National Screen Serv. Corp.,* 349 U.S. 322, 327, 75 S.Ct. 865, 99 L.Ed. 1122 (1955); *International Philanthropic Hosp. Found. v. United States,* 223 Ct.Cl. 587, 590, 621 F.2d 402, 403 (1980); *Mosely v. United States,* 15 Cl.Ct. 193, 194 (1988).

2. *Collateral Estoppel (Issue Preclusion)*

■■■■ "The principle of collateral estoppel dictates that an issue that is fully and fairly litigated, is determined by a final judgment, and is essential to that judgment, is conclusive in a subsequent action between the same parties." *Bingaman v. Department of the Treasury,* 127 F.3d 1431, 1436–37 (Fed.Cir.1997). Collateral estoppel, also referred to as the doctrine of issue preclusion, complements *res judicata* in "reliev[ing] parties of the cost and vexation of multiple lawsuits, conserv[ing] judicial resources, and, by preventing inconsistent decisions, encourag[ing] reliance on adjudication." *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). Collateral estoppel helps to promote the policy "that there be an end of litigation; that those who have contested an issue shall be bound by the result of the contest, and that matters once tried shall be considered forever settled as between the parties." *Baldwin v. Iowa State Traveling Men's Ass'n,* 283 U.S. 522, 525, 51 S.Ct. 517, 75 L.Ed. 1244 (1931).

■■■ Despite their identical goals, claim preclusion and issue preclusion operate in different ways. "A critical difference between these concepts is that issue preclusion operates only as to issues actually litigated, whereas claim preclusion may operate between the parties simply by virtue of the final judgment." *Young Eng'rs, Inc. v. United States Int'l Trade Comm'n,* 721 F.2d 1305, 1314 (Fed.Cir.1983). Whereas *res judicata* binds parties as to all matters that were, or could have been, raised in a prior litigation, collateral estoppel only bars subsequent litigation of issues that were actually litigated in a prior suit. "Collateral estoppel is appropriate when, upon a different cause of action between identical parties, a party attempts in the later case to contest an issue which was actually contested between the parties in a prior action and 'upon the determination of which the finding or verdict was rendered.'" *McMullan v. United States,* 231 Ct.Cl. 378, 381, 686 F.2d 915, 918 (1982) (citation omitted).

■■■■ Like *res judicata,* collateral estoppel operates only between the same parties, or those in privity with the parties, who took part in a prior suit. The preclusive effect of collateral estoppel should not be extended to a nonparty to the prior suit, unless the Court determines that a party to the earlier suit "is so closely aligned with the non-party's interests as to be its virtual representative." *Mother's Restaurant,* 723 F.2d at 1572. Issue preclusion may also operate against a nonparty who "controls or substantially participates in the control of the presentation on behalf of a party." *Id.*

3. *Stare Decisis*

■■■■ The doctrine of *stare decisis* is "one of the fundamental building blocks of our nation's legal system." *Bankers Trust N.Y. Corp. v. United States,* 36 Fed.Cl. 30, 37 (1996). In essence, *stare decisis* "makes each judgment a statement of the law, or precedent, binding in future cases before the same court or another court owing obedience to its decision." *Mendenhall v. Cedarapids, Inc.,* 5 F.3d 1557, 1570 (Fed.Cir.1993). "[T]he doctrine compels lower courts to follow the decisions of higher courts on questions of law." 18 JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE § 134.01[1] (3d ed.1998). In addition, the doctrine counsels a court to

follow "its own previous decisions unless and until they have been overruled or undermined by the decision of a higher court or a statutory overruling." *Id.* § 134.02[1][a]. Adherence to the doctrine "promotes the evenhanded, predictable, and consistent development of legal principles." *Payne v. Tennessee,* 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). Indeed, "no judicial system could do society's work if it eyed each issue afresh in every case that raised it." *Planned Parenthood v. Casey,* 505 U.S. 833, 854, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992); *see also George v. United States,* 30 Fed.Cl. 371, 377 (1994) (refusing to "re-litigate the exact same issue that was raised in" a previous case brought by a different plaintiff), *aff'd,* 90 F.3d 473 (Fed.Cir.1996).

Like *res judicata* and collateral estoppel, *stare decisis* allows courts to achieve the goal of finality of litigation. The doctrine prevents the needless relitigation of questions of law that have previously been decided. Unlike the doctrines of claim preclusion and issue preclusion, however, *stare decisis* is applicable to litigants who have not been parties to prior litigation. In the absence of a subsequent overruling or change in applicable law, a question of law decided by a court is binding upon all future litigants in the lower courts subject to that court's appellate jurisdiction. For example, questions of law decided by the United States Court of Appeals for the Federal Circuit ("Federal Circuit") constitute binding precedent upon this Court. *See Southern Cal. Edison Co. v. United States,* 38 Fed.Cl. 54, 62 (1997) (holding that the United States Court of Federal Claims ("Court of Federal Claims") must accept as controlling precedent a decision by the Federal Circuit addressing the very issue before the lower court); *Compliance Corp. v. United States,* 22 Cl.Ct. 193, 204–05 n. 9 (1990) (asserting that "decisions of the Federal Circuit are binding on the Claims Court [predecessor of the Court of Federal Claims]"), *aff'd,* 960 F.2d 157 (Fed.Cir.1992).

## C. The Prior Adjudications

The doctrines of *res judicata,* collateral estoppel, and *stare decisis* all rely upon the existence of previously adjudicated cases. For purposes of this Opinion, the relevant prior cases are *Yankee Atomic Electric Co. v. United States,* 112 F.3d 1569 (Fed.Cir.1997), *rev'g* 33 Fed.Cl. 580 (1995), *cert. denied,* —— U.S. ——, 118 S.Ct. 2365, 141 L.Ed.2d 735 (1998); *Barsebäck Kraft AB v. United States,* 121 F.3d 1475 (Fed.Cir.1997), *aff'g* 36 Fed.Cl. 691 (1996); and *Centerior Service Co. v. United States,* No. 95–103C (Fed.Cl. Dec. 17, 1997).

### 1. Yankee Atomic

The Yankee Atomic Electric Co. ("Yankee"), was a domestic utility which had used Government-produced enriched uranium prior to October 23, 1992. After passage of the EP Act in October 1992, the DOE assessed Yankee for its share of the annual D & D Fund special assessment. By the time Yankee filed its suit in the Court of Federal Claims in 1994, it had paid three annual assessments amounting to approximately $3 million. *Yankee Atomic,* 33 Fed.Cl. at 583.

In its suit for recovery of a portion of the assessments, Yankee advanced three theories of recovery, only two of which are relevant to the instant case. First, Yankee maintained that the special assessment amounted to a breach of contract, "in that it retroactively increases the cost of the Government's uranium enrichment services, thereby violating the 'fixed-price' character of the contracts under which those services initially were obtained." *Id.* at 582. Second, Yankee argued that the special assessment "constitutes the deprivation of a contract-based advantage and hence, the taking of a property right." *Id.*[4]

The trial court determined that the special assessment "amount[ed] to a deprivation of property 'already acquired'." *Id.* at 584. The Court concluded:

> that, as applied to plaintiff, the special assessment amounts, in part, to an unlaw-

---

**4.** The third theory of recovery, which ultimately proved unavailing, argued that Yankee should not be assessed because it had ceased operations prior to passage of the EP Act. *Yankee Atomic,* 33 Fed.Cl. at 582.

ful exaction because it violates the Government's earlier commitments to supply enriched uranium at contract prices not to exceed a stated amount and thus improperly diminishes the value of the property (the economic advantage) that plaintiff acquired pursuant to those commitments.

*Id.* at 586. The Court granted the plaintiff's motion for summary judgment.

On appeal, however, the Federal Circuit reversed the judgment of the trial court. *Yankee Atomic Elec. Co. v. United States,* 112 F.3d 1569 (Fed.Cir.1997). Invoking the sovereign acts doctrine,[5] the Federal Circuit held that the Government's imposition of the special assessment upon all domestic utilities that purchased enriched uranium from the DOE prior to the passage of the EP Act "constitutes a general exercise of Congress's taxing power for the purpose of addressing a societal problem rather than an act that retroactively increases the price charged to contracting parties for uranium enrichment services." *Yankee Atomic,* 112 F.3d at 1577. Also noting the applicability of the unmistakability doctrine,[6] the appellate court concluded "that the contracts between Yankee Atomic and the Government did not include an unmistakable promise that precluded the Government from later imposing an assessment upon all domestic utilities that employed the DOE's uranium enrichment services." *Id.* at 1580. The court's conclusion disposed of Yankee's breach of contract claims and its takings argument as well: "Because the contracts did not contain an unmistakable promise against a future as-

sessment, Yankee Atomic had no property right (via a vested contract right) which was subsequently taken by the assessment." *Id.* at 1580 n. 8. Yankee's petition for a writ of certiorari was recently denied by the Supreme Court. ——— U.S. ———, 118 S.Ct. 2365, 141 L.Ed.2d 735 (1998).

### 2. *Barsebäck*

The plaintiffs in this case were two foreign utilities, Barsebäck Kraft AB ("Barsebäck") and Empresa Nacional del Uranio, S.A. ("ENUSA"), that had entered into uranium enrichment services contracts with the DOE in 1984. The plaintiffs alleged that from July 1, 1993, the date on which the USEC assumed responsibility for their contracts, they had been overcharged for the uranium enrichment services provided by the USEC, in violation of their contracts.[7]

The plaintiffs asserted three theories of recovery in the *Barsebäck* complaint. First, the plaintiffs argued that the USEC violated contract pricing provisions by departing from the cost-based pricing methodology that had been used by the DOE. Second, the plaintiffs contended that, even if the USEC was not required to follow a cost-based methodology, the USEC breached its contracts with the plaintiffs by failing to establish prices in accordance with a good-faith market price standard. Third, the utilities alleged that the USEC wrongfully double charged them for D & D and remedial costs—once in the contract price for enrichment services and again via the yearly special assessment.

---

**5.** The sovereign acts doctrine "is designed to distinguish between the Government's twin roles as contractor and sovereign." *Yankee Atomic,* 112 F.3d at 1575 (citing *United States v. Winstar Corp.,* 518 U.S. 839, 892, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996)). Pursuant to the doctrine, "the United States when sued as a contractor cannot be held liable for an obstruction to the performance of the particular contract resulting from its public and general acts as a sovereign." *Horowitz v. United States,* 267 U.S. 458, 461, 45 S.Ct. 344, 69 L.Ed. 736 (1925).

**6.** The unmistakability doctrine "marks the point of intersection between two fundamental constitutional concepts." *Winstar,* 518 U.S. at 872, 116 S.Ct. 2432. The first is parliamentary sovereignty, which "posits that because the legislature

has absolute authority and acknowledges no superior power, it cannot be bound by acts of a prior legislature." *Yankee Atomic,* 112 F.3d at 1577. The second concept "is that legislative power may be limited under certain circumstances." *Id.* The unmistakability doctrine "is a canon of construction that attempts to balance these two somewhat competing concepts by allowing the Government to make agreements that bind future Congresses, but only if those contracts contain an unmistakable promise [to bind future Congresses]." *Id.* at 1578.

**7.** The plaintiffs also alleged that the USEC's pricing policy violated treaties between the United States and the plaintiffs' respective nations. That argument proved unsuccessful and is, in any event, irrelevant to the case at bar.

This Court granted the defendant's motion for summary judgment on all counts. As to the first theory of recovery, the Court held that the USEC was not constrained to charge for its services on the basis of recovery of Government costs. "[T]he contracts explicitly provide that the DOE [and subsequently the USEC] could establish 'any pricing policy.'" *Barsebäck*, 36 Fed.Cl. at 703. Whereas a statute imposed an extra-contractual constraint upon the DOE to price its services pursuant to a cost-recovery methodology, Congress repealed that constraint in the EP Act, replacing it with the mandate that "the USEC shall establish 'prices for its * * * services provided to customers other than the Department on a basis that will allow it to attain the normal business objectives of a profitmaking corporation.'" *Id.* (quoting 42 U.S.C. § 2297c–1(a) (1994)).

With respect to the second theory of recovery, the Court held that:

the Court is unwilling to infer a good-faith limitation on the USEC's pricing discretion because the contracts already include a significant, bargained-for limitation on the USEC's pricing discretion. * * * The "ceiling price" is a significant limitation on the USEC's pricing discretion, preventing the USEC from pricing the contracts in a manner that is completely disassociated from the market. * * * As such, the Court, in this instance, is unwilling to add protections beyond those significant contractual safeguards in place and for which the plaintiffs bargained.

*Id.* at 706.

As to the third theory of recovery, the Court found the plaintiffs' double-charging argument to be "legally untenable under the Energy Policy Act of 1992." *Id.* at 707. Analyzing the EP Act, the Court concluded that "the [D & D] Fund is wholly separate from the USEC * * *. * * * As such, the USEC does not, and indeed by law cannot, include in its prices a charge for D & D and remedial costs." *Id.*

The plaintiffs appealed the Court's grant of summary judgment in favor of the defendant. *Barsebäck Kraft AB v. United States*, 121 F.3d 1475 (Fed.Cir.1997). The plaintiffs raised two grounds for appeal that are relevant to the instant case. First, the plaintiffs contended that the contracts' pricing provision was ambiguous, thus raising factual issues not properly resolved by summary judgment. Second, the plaintiffs again asserted that the Government improperly double recovered its D & D costs.

As to the ambiguity claim, the Federal Circuit found no ambiguity in the contract pricing provision:

The contracts state that the price to be paid is to be determined by the policy existing at the time the uranium enrichment services are provided. When the services at issue were provided, the government's policy was to charge an amount that recovered not just its costs but also produced a profit, while remaining below the ceiling. We find nothing in the pricing provision or elsewhere in the contracts that limits USEC's ability to price its services in this manner, which, of course, is mandated by statute.

*Barsebäck*, 121 F.3d at 1480. The plaintiffs also alleged that competitive pricing language in the recital, or "Whereas," clauses of their contracts rendered the agreements ambiguous. The Federal Circuit concluded that these clauses, which recited certain DOE intentions and desires, did not render the contracts ambiguous. In addition, the court determined that "facially these clauses express only desires, not binding commitments." *Id.* at 1481. Finally, the court concluded that the contracts unambiguously "place the risk of any changed government pricing policy on Barsebäck and ENUSA." *Id.*

With respect to the double-recovery allegation, the court held that "it is beyond dispute that USEC is not literally charging its customers an amount used for, or intended to finance, the government's D & D efforts." *Id.* at 1482 (quoting 42 U.S.C. § 2297g–1).

Consequently, the Federal Circuit affirmed the judgment of the Court of Federal Claims with respect to all of the plaintiffs' claims.

### 3. *Centerior*

Originally, 11 plaintiffs joined in filing the action captioned as *Centerior Service Co. v. United States*, No. 95–103C (Fed.Cl. Dec. 17,

1997): Baltimore Gas and Electric Company ("BG & E"); Centerior Service Company ("Centerior"); Consolidated Edison Company of New York, Inc. ("ConEd"); Duquesne Light Company; Florida Power & Light Company ("FP & L"); IES Utilities, Inc. ("IES"); Pennsylvania Power and Light Company ("PP & L"); Public Service Electric and Gas Company; Southern California Edison Company; Wisconsin Electric Power Company ("WEPCo"); and Wolf Creek Nuclear Operating Corporation ("Wolf Creek"). In their complaint, the plaintiffs in *Centerior* asserted the same breach of contract counts that were asserted by the *Barsebäck* plaintiffs.[8] As it did in *Barsebäck*, the defendant filed a motion for summary judgment in *Centerior*. While a decision on the defendant's motion for summary judgment was pending in *Centerior*, the defendant's parallel motion for summary judgment was granted in *Barsebäck*. The *Barsebäck* plaintiffs appealed that decision in the Federal Circuit. Due to the identicalness of facts and legal issues between *Barsebäck* and *Centerior*, this Court stayed proceedings in *Centerior* pending a decision by the Federal Circuit in the appeal of *Barsebäck*.

Between July 7, 1995, and October 24, 1997, the parties to *Centerior* stipulated to the dismissal, with prejudice, of the claims of five of the *Centerior* plaintiffs: BG & E, FP & L, IES, PP & L, and Wolf Creek.

After the Federal Circuit affirmed *Barsebäck* in July 1997, the defendant renewed its motion for summary judgment in *Centerior*. The Court granted the defendant's motion for the same reasons that summary judgment was granted in favor of the defendant in *Barsebäck*. With respect to the count alleging the impropriety of the USEC's pricing policy and the count alleging improper double recovery, the Court invoked *stare decisis* as an additional ground for granting the defendant's motion, as the Federal Circuit had expressly ruled on those two questions of law in the *Barsebäck* appeal. The *Centerior*

plaintiffs did not appeal this Court's decision to grant the defendant's motion for summary judgment.

## II. *Application of Legal Doctrines to the Plaintiffs' Claims*

### A. *Res Judicata*

For reasons that will become apparent in the ensuing discussion, the Court will examine the applicability of *res judicata* as to six of the seven plaintiffs together and will then separately consider the applicability of the doctrine to plaintiff Niagara.

#### 1. *ConEd, ENUSA, FP & L, IES, PP & L, and WEPCo*

ENUSA was a plaintiff in *Barsebäck*. ConEd and WEPCo were plaintiffs in *Centerior*. The United States was the defendant in both *Barsebäck* and *Centerior*. Summary judgment was entered in favor of the defendant in both cases. Summary judgment is a final judgment on the merits for *res judicata* purposes. *See Kunkes*, 78 F.3d at 1550 n. 2. FP & L, IES, and PP & L were plaintiffs in *Centerior*, but voluntarily dismissed their suits "with prejudice" prior to the entry of summary judgment in that case. A voluntary dismissal "with prejudice" constitutes a final judgment on the merits for claim preclusion purposes. *See Lawlor*, 349 U.S. at 327, 75 S.Ct. 865. Consequently, final judgments on the merits have been rendered in prior litigations involving the same defendant[9] and six of the seven plaintiffs in the case at bar. The applicability of the doctrine of claim preclusion to these six plaintiffs, therefore, depends upon a determination of whether or not the instant suit involves the same claims that were asserted in *Barsebäck* and *Centerior*.

A claim is comprised of all rights a plaintiff has against a particular defendant "with respect to all or any part of the transaction, or series of connected transactions, out of which

8. The *Centerior* plaintiffs, all domestic utilities, did not assert the treaty violation count that had been asserted by the foreign plaintiffs in *Barsebäck*. With the exception of this theory of recovery, the complaints filed in the two cases were virtually identical.

9. The fact that the defendant acted through the USEC in the two prior suits, and through the DOE in the instant suit, is irrelevant. For *res judicata* purposes, the defendant in all cases is the United States. *See Burnett*, 40 Fed.Cl. at 809 n. 5; *Bass*, 11 Cl.Ct. at 299.

the action arose." *Container Transp.*, 199 Ct.Cl. at 718, 468 F.2d at 929. The breach of contract theories asserted in the instant case arise from the same transaction that gave rise to the breach of contract claims asserted in *Barsebäck* and *Centerior*: the Government's imposition of a special assessment upon domestic utilities to fund its decontamination and decommissioning activities. The core contention of the plaintiffs in *Barsebäck*, *Centerior*, and the instant case, all of whom are represented by the same counsel, is that the Government harmed them by imposing the special assessment upon them without implementing a corresponding decrease in the price of uranium enrichment services provided pursuant to their contracts. This core contention has been couched in several differently worded "theories of recovery" advanced in the case at bar and the two prior litigations. All of these various theories of recovery, however, arise from the very same transaction and seek recovery based on the same governmental conduct in the administration of the very same contracts. Consequently, the theories of recovery advanced in the instant action comprise part of the same claim that was litigated in *Barsebäck* and *Centerior*. Under the general principles of *res judicata*, the instant suit should be barred in order to "protect[ ][the] defendant[ ] from repetitive lawsuits based on the same conduct." *Marrese*, 470 U.S. at 385, 105 S.Ct. 1327.

■ *Res judicata* will bar a suit if a plaintiff has previously been presented with a full and fair opportunity to litigate part of a claim. A second suit will not be precluded if the cause of action asserted therein was not available during the pendency of a previous suit, even though the claim may arise from the same series of transactions that gave rise to the first suit. *See Everett Plywood*, 206 Ct.Cl. at 251, 512 F.2d at 1087. For example, if the instant suit presented a claim for a breach of the uranium enrichment services contracts that occurred after the dates that judgment had been respectively rendered in *Barsebäck* and *Centerior*, *res judicata* would not operate to bar the claim. Claim preclusion does not immunize a defendant from liability for future breaches of a continuing contract because, at the time of the prior

suit, the plaintiff could not litigate causes of action that had not yet accrued.

The plaintiffs' claim, however, is for damages incurred as a result of a breach that allegedly occurred prior to the dates that *Barsebäck* and *Centerior* were filed in this Court. In a breach of contract action, the first suit filed generally must claim every breach that has by then occurred. *See* 18 Charles Alan Wright et al., *supra*, § 4408. "[I]f the claimant, before filing its first suit, is in possession of all the facts on which its second suit is based, the splitting of the claims into multiple suits is fatal to maintenance of the later-filed action." *Alyeska*, 231 Ct.Cl. at 546, 688 F.2d at 769.

Notwithstanding the fact that they allege a breach that occurred before the filing of the prior suits, the plaintiffs attempt to avoid the operation of *res judicata* by maintaining that their claims for damages for the period of September 1, 1992, through June 30, 1993, could not have been asserted in *Barsebäck* or *Centerior*. In support of this proposition, the plaintiffs contend that they could not bring their claims for the period in question in this Court until the DOE contracting officer had issued final decisions on those claims and that the final decisions were not issued until October 1995. *Centerior* was filed in this Court on February 9, 1995, and *Barsebäck* was filed in this Court on June 22, 1995. The plaintiffs opine that the instant claims for breach of contract damages incurred prior to July 1, 1993, simply could not have been joined to their claims for breach of contract damages for the period beginning on July 1, 1993.

The plaintiffs acknowledge that they had received the contracting officer's final decisions denying their instant claims by October 13, 1995. The decision in *Barsebäck* was issued on August 9, 1996, and the decision in *Centerior* was issued on December 17, 1997. All of the plaintiffs in the instant case, with the exception of Niagara, were presented with ample time to amend their respective complaints in *Barsebäck* and *Centerior* to include the claims asserted in the case at bar. The plaintiffs were in possession of all of the facts upon which their present claims are

based at the time that *Barsebäck* and *Centerior* respectively were filed, and the instant allegations arise out of the same transaction that gave rise to those prior actions. Consequently, the instant claims could and should have been raised in the prior litigations. Although the plaintiffs delayed submitting the present claims to the contracting officer until after they had filed suit in *Barsebäck* and *Centerior*, they could and should have amended their complaints in those prior cases to include the present claims once the contracting officer's final decisions had been issued. *See Everett Plywood*, 206 Ct.Cl. at 252, 512 F.2d at 1087; *Electric Boat*, 81 Ct.Cl. at 368; *Montego Bay Imports*, 25 Cl. Ct. at 653 (all requiring amendment of complaint if claim arising out of the same transaction is capable of being asserted prior to decision being rendered).

In a final attempt to avoid the operation of *res judicata*, the plaintiffs contend that the Contract Disputes Act, 41 U.S.C. §§ 609 *et seq.*, expressly permits them to split claims into several lawsuits. In support of this position, the plaintiffs cite the following provision:

> If two or more suits arising from one contract are filed in the United States Court of Federal Claims and one or more agency boards, for the convenience of parties or witnesses or in the interest of justice, the United States Court of Federal Claims may order the consolidation of such suits in that court or transfer any suits to or among the agency boards involved.

41 U.S.C. § 609(d) (1994). Relying on this provision, the plaintiffs recite the truism that "the Contract Disputes Act ('CDA') specifically recognizes that separate suits may be filed on the same contract," and that "the fact that two claims arise out of the same contract does not necessarily mean that they must be prosecuted together." (Pls.' Mem. in Opp'n at 10.)

 The plaintiffs' statements ring true, but are nonetheless unavailing. Nothing in the CDA abrogates principles of claim preclusion. Although the CDA allows the plaintiffs to bring *different* claims arising out of the same contract in different suits, it does not authorize plaintiffs to bring different theories of recovery based on the *same* claim in separate suits. It is the latter situation that is present in the instant case. The theories of recovery asserted in the case at bar arise out of the same transaction that gave rise to the *Centerior* and *Barsebäck* suits and, thus, constitute part of the same claim that was litigated in those prior cases. Nothing in the CDA permits the vexatious repetition of litigation based on the same conduct of the defendant that *res judicata* is designed to prevent. Accordingly, the doctrine of claim preclusion bars plaintiffs ConEd, ENUSA, FP & L, IES, PP & L, and WEPCo from maintaining the instant suit.

### 2. *Niagara*

Claim preclusion bars a subsequent suit if there has been a prior litigation (1) involving the same claim, (2) between the same parties or their privies, and (3) which resulted in a final judgment on the merits by a court of competent jurisdiction. *See Blonder–Tongue*, 402 U.S. at 323–24, 91 S.Ct. 1434. Unlike the other six plaintiffs in this case, Niagara was not a party to either *Barsebäck* or *Centerior*. The defendant cites, as a prior litigation involving both Niagara and the defendant, *Niagara Mohawk Power Corp. v. United States*, No. 96–218C (Fed.Cl.). In that pending case, Niagara asserts claims identical to those asserted by a different plaintiff in the case *Yankee Atomic Electric Co. v. United States*, 33 Fed.Cl. 580, 582 (1995), *rev'd*, 112 F.3d 1569 (Fed.Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 2365, 141 L.Ed.2d 735 (1998).

The allegations asserted by Niagara in the instant case arise from the same transaction that gave rise to the allegations asserted by Niagara in *Niagara Mohawk*, No. 96–218C— the imposition by the Government of a special assessment upon domestic utilities to fund its decontamination and decommissioning activities. Consequently, the instant suit involves the same claim that is being asserted in *Niagara Mohawk*. *See Container Transp.*, 199 Ct.Cl. at 718, 468 F.2d at 929 (explaining that a "claim" is comprised of all rights a plaintiff has against a particular defendant "with respect to all or any part of the transaction * * * out of which the action

arose."). In addition, the parties to the instant suit are the same parties that are involved in *Niagara Mohawk*. The applicability of *res judicata* hinges on whether or not there has been a final judgment on the merits.

*Niagara Mohawk* is currently pending in this Court. Consequently, no final judgment on the merits has been entered in that case that would create a *res judicata* effect. The defendant argues that, in light of the Supreme Court's denial of certiorari in *Yankee Atomic*, the outcome of *Niagara Mohawk* is a foregone conclusion merely awaiting a judgment in favor of the Government. This Court is unaware of any authority, however, which allows it to preclude a plaintiff's claim based on anticipatory *res judicata* effect of a pending litigation. With no prior final judgment upon which to rely, this Court holds that, with respect to plaintiff Niagara, the defendant's claim preclusion argument is premature.

■ The defendant also argues that Niagara was "virtually represented" by the six other plaintiffs in *Barsebäck* and *Centerior*, and thus the final judgments on the merits of those cases have a preclusive effect upon Niagara in the case at bar. Virtual representation, however, is a narrow theory that may be invoked against a nonparty to a prior suit only "if one of the parties to the earlier suit is so closely aligned with the non-party's interests as to be its virtual representative." *Mother's Restaurant*, 723 F.2d at 1572. In assessing whether or not one party was another's virtual representative, courts look at several factors, including an identity of interests; a close relationship outside the litigation context; participation by the nonparty in funding or controlling the first suit; deliberate maneuvering to avoid the effects of the first action; and the existence of an express or implied legal relationship from which the parties to the first suit are said to be accountable to parties to the second suit. *See Becherer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 43 F.3d 1054, 1070 (6th Cir. 1995); *Gonzalez v. Banco Cent. Corp.*, 27 F.3d 751, 760–63 (1st Cir.1994); *see generally* 18 CHARLES ALAN WRIGHT ET AL., *supra*, § 4457. Although an identity of interests is

"a necessary condition for triggering virtual representation, it is not alone a sufficient condition." *Gonzalez*, 27 F.3d at 760.

■ The defendant's motion does not set forth an adequate basis for applying the narrow theory of virtual representation against plaintiff Niagara. While Niagara undoubtedly shared identical interests with the plaintiffs in *Barsebäck* and *Centerior*, such a showing by itself is not sufficient to hold that Niagara was virtually represented in those prior cases. The defendant has not shown that Niagara participated to any extent in the prior suits; that there exists a legal relationship from which the plaintiffs in the two prior suits can be said to be accountable to Niagara; or that Niagara has deliberately maneuvered to avoid the effects of the prior actions.

The alignment of interests between Niagara and the plaintiffs in *Barsebäck* and *Centerior* does not remotely approach the alignment of interests present in *Mother's Restaurant*, the only case in which the Federal Circuit has expressly applied virtual representation. In *Mother's Restaurant*, a licensor was collaterally estopped from relitigating issues that had previously been litigated by one of its licensees, because it was determined that the licensee was the licensor's agent; that the licensor was the "real party in interest" in the prior case; and that the licensor had paid the legal costs of the prior litigation and had exercised a degree of control over the conduct of the prior legal proceedings. *See Mother's Restaurant*, 723 F.2d at 1573 & n. 11. In the absence of such strong indices of alignment between Niagara and the plaintiffs in *Barsebäck* and *Centerior*, virtual representation does not operate to preclude the claims raised by Niagara in the instant suit.

### B. *Collateral Estoppel*

Collateral estoppel bars the relitigation (1) between the same parties, (2) of an issue that has been fully and fairly litigated, (3) that has been determined by a final judgment, and (4) that was essential to that prior judgment. *See Bingaman*, 127 F.3d at 1436–37. As explained earlier in this Opinion, in Part

II.A.2., plaintiff Niagara has not been a party to a prior litigation that has been determined by a final judgment.[10] As also explained in Part II.A.2., Niagara was not so closely aligned with the plaintiffs in *Barsebäck* or *Centerior* so as to have been virtually represented by the plaintiffs in those cases. The defendant also has failed to show the requisite indices of alignment to support its contention that Niagara was virtually represented by Yankee in the case of *Yankee Atomic.* Consequently, collateral estoppel does not operate to bar any of the issues raised by Niagara in the instant case.

## C. *Stare Decisis*

The doctrine of *stare decisis* compels this Court to follow questions of law decided by the Federal Circuit. *See Southern Cal. Edison,* 38 Fed.Cl. at 62; *Compliance Corp.,* 22 Cl.Ct. at 204–05 n. 9; *see generally* 18 JAMES WM. MOORE, *supra,* § 134.01[1]. Even though plaintiff Niagara did not participate as a litigant in *Barsebäck* or *Yankee,* this Court is bound to apply to Niagara questions of law that were squarely addressed by the Federal Circuit in those prior cases.

■ As one of its four theories of recovery, Niagara alleges that the defendant's attempts to collect D & D and remedial costs constituted "an impermissible demand for 'additional compensation from plaintiffs (for the same services)' already paid for, conduct proscribed by *Yankee Atomic Electric Company v. the United States,* 33 Fed.Cl. 580 (1995)." (Compl. ¶ 21.) *Yankee Atomic,* however, does not proscribe such conduct by the defendant. The Federal Circuit reversed that decision, deciding as a matter of law that the Government's imposition of the special assessment was a proper "exercise of Congress's taxing power for the purpose of addressing a societal problem rather than an act that retroactively increases the price charged to contracting parties for uranium enrichment services." *Yankee Atomic,* 112

F.3d at 1577. The Supreme Court subsequently denied Yankee's petition for certiorari. Accordingly, the Federal Circuit's decision stands as binding precedent on this Court. *Stare decisis* prevents this Court from reaching a different result and thus Niagara's *Yankee* theory of recovery must be dismissed as a matter of law.[11]

■ An alternate theory of recovery advanced by Niagara is that the DOE's failure to reduce its contract prices to reflect funds contributed to the D & D Fund breached "commitments to provide competitive pricing made by DOE at the time the contracts were entered into (as manifested in part in the third Whereas clause of the Contracts and in DOE's contemporaneous declarations of its intent)." (Compl. ¶ 21.) In *Barsebäck,* the Federal Circuit examined the very same "Whereas" clause that Niagara relies upon in this theory of recovery. That clause states that the "DOE *intends* to serve as a reliable long-term supplier of uranium enrichment services at predictable prices while providing the most competitive prices possible through technological innovation." *Barsebäck,* 121 F.3d at 1481. In interpreting this provision, the Federal Circuit expressly rejected "ENUSA's argument that [this] clause[] mandate[s] that the government offer the most competitive possible price while avoiding the need for a government subsidy." *Id.* Rather, the Federal Circuit determined as a matter of law that this clause, like other "Whereas" clauses in the recital portion of the contract, did not "mandate" anything: "[F]acially these clauses express only desires, not binding commitments." *Id.* The very argument raised by Niagara has already been squarely decided by the Federal Circuit. The doctrine of *stare decisis* proscribes this Court from reaching a contrary interpretation of the same contractual provision. Accordingly, this theory of recovery also fails as a matter of law.[12]

---

10. Because *res judicata* bars the instant suit with respect to the six plaintiffs other than Niagara, the applicability of collateral estoppel to the issues raised by those six plaintiffs will not be examined.

11. *Stare decisis* would similarly require the dismissal of the *Yankee* claim of the other six plain-

tiffs, if they were not barred from maintaining the instant suit by the doctrine of *res judicata.*

12. *Stare decisis* would similarly require the dismissal of this theory of recovery with respect to the six plaintiffs other than Niagara, if they were not barred from maintaining the instant suit by the doctrine of *res judicata.* Moreover, plaintiff

Niagara's remaining two theories of recovery may best be considered together. Those theories assert that the DOE breached its contract with Niagara by purportedly including D & D and remedial costs in its FY 1993 charges and that this breach resulted in an impermissible double recovery of the same costs that were paid by the plaintiff via the D & D Fund. (Compl.¶¶ 18–21.) Niagara's theories spring from the pricing provision set out in Article IV of its standardized uranium enrichment services contract. That Article provides, in pertinent part:

1. The charges to be paid to DOE for enrichment services provided to the Customer hereunder will be determined in accordance with the established DOE pricing policy for such services; provided that the unit charge for enrichment services under this contract shall not exceed a ceiling charge of $135.00 per separative work unit through September 30, 1985. After that date, the ceiling charge is subject to adjustment to reflect changes in DOE's costs, including changes in electrical rates and the purchasing power of the U.S. dollar.

In *Yankee Atomic*, a case arising from the same core facts that gave rise to the instant suit, the Federal Circuit interpreted the above standard pricing provision. The Federal Circuit concluded that "[t]he language of the contract is directed at the prices charged for providing enriched uranium to [the plaintiff], and not to any decontamination or decommissioning costs which may subsequently arise. Thus, the contract states that '[t]he charges [are] to be paid to [DOE] *for enrich[ment] services provided.*'" *Yankee Atomic*, 112 F.3d at 1580. Moreover, the Federal Circuit held that the standardized uranium enrichment services contracts do "not include an unmistakable promise that preclude[s] the Government from later imposing an assessment upon all domestic utilities that employed the DOE's uranium enrichment services." *Id.*

▮▮▮ Contract interpretation is a question of law. *See Muniz v. United States*, 972 F.2d 1304, 1309 (Fed.Cir.1992). Questions of

law resolved by the Federal Circuit constitute binding precedent on this Court. *See Southern Cal. Edison*, 38 Fed.Cl. at 62; *Compliance Corp.*, 22 Cl.Ct. at 204–05 n. 9. Consequently, the principles of *stare decisis* proscribe this Court from reinterpreting specific provisions of the standardized uranium enrichment services contracts that have already been interpreted by the Federal Circuit in a case that arose from the same underlying transaction as the case at bar.

▮▮▮ Niagara's position in the instant case conflicts with the precedential issues of law that this Court is bound to follow. Niagara's position would require this Court to interpret the pricing provision of its contract to include decontamination and decommissioning costs. Only through such an interpretation could it be said that the DOE breached the contract by including D & D costs in its FY 1993 prices. The Federal Circuit held in *Yankee Atomic*, however, that the pricing provision of the standard uranium enrichment services contracts "is directed at the prices charged for providing enriched uranium to [the plaintiff], and not to any decontamination or decommissioning costs which may subsequently arise." *Yankee Atomic*, 112 F.3d at 1580. Moreover, the Federal Circuit held that, in addition to collecting the full contract price for enrichment services provided pursuant to the contract, the Government could, as a legitimate exercise of its taxing power, "tax[ ] all beneficiaries of the DOE's uranium enrichment services [through imposition of the special assessment] * * * for the purpose of addressing a societal problem." *Id.* at 1577.

In light of the express conclusions of the Federal Circuit in *Yankee Atomic*, Niagara's theory that the Government breached its contract by imposing both a contract price for uranium enrichment services and a tax for decontamination and decommissioning costs must fail as a matter of law. Likewise, Niagara could not show that the Government's collection of both the special assessment and the full contract price was an "impermissible" double recovery: *Yankee Atomic* specifically determined that the Gov-

ENUSA litigated this very issue before the Federal Circuit in *Barsebäck* and, thus, would also be barred from relitigating this issue under the doc-

trine of collateral estoppel, if it were not barred from maintaining the instant suit by the doctrine of *res judicata*.

ernment's collection of both types of charges was legally permissible. Because the theories advanced by Niagara are precluded by conclusions of law already decided by the Federal Circuit, Niagara could present no set of facts in support of those theories that would entitle it to relief. Consequently, Niagara's final two theories of relief must be dismissed as a matter of law.[13]

## CONCLUSION

For the aforementioned reasons, the Defendant's Motion for Judgment on the Pleadings is granted. The plaintiffs' Complaint is to be dismissed with prejudice as to all plaintiffs. The Clerk of the Court is directed to enter judgment accordingly.

Each party is to bear its own costs.

---

**13.** The principles of *stare decisis* would similarly require the dismissal of these two theories of recovery with respect to the six plaintiffs other than Niagara, if they were not barred from maintaining the instant suit by the doctrine of *res judicata.*